UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

105 MT. KISCO ASSOCIATES LLC,
AMANDA'S LANE LLC, and MARK STAGG,

                                        Plaintiffs,

        -against-

PAUL CAROZZA, RICHARD'S LUMBER &
BUILDING MATERIALS CENTER, INC.,
CANRAD as successor to CANADIAN RADIUM
& URANIUM CORP., VILLAGE OF MOUNT
KISCO, MT. KISCO URBAN RENEWAL
AGENCY, WESTCHESTER COUNTY
DEPARTMENT OF HEALTH, UNITED STATES,
TELEDYNE ENVIRONMENTAL, INC. as
successor to ISOTOPES INC., WESTWOOD
NUCLEAR CORP. as successor to ISOTOPES
INC., NDL ORGANIZATION, INC., as successor
to NUCLEAR DIAGNOSTICS LABORATORIES,
INC., MERRITT ENVIRONMENTAL
CONSULTING CORP., DOES 1 through 50, and
DOES 51 through 100,

                                        Defendants.

No. 15 Civ. 5346 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

        Plaintiffs 105 Mt. Kisco Associates LLC ("105 Mt. Kisco Associates"), Amanda's Lane

LLC ("Amanda's Lane") and Mark Stagg ("Stagg") (collectively, "Plaintiffs") bring this action

pursuant to the Comprehensive Environmental Response, Compensation and Liability Act

("CERCLA"), 42 U.S.C. § 9601 *et. seq.*, against Defendants Paul Carozza ("Carozza"); Richards

Home Center & Lumber, Inc.; Village of Mount Kisco (the "Village"); Mt. Kisco Urban Renewal

Agency ("MKURA"); Westchester County Department of Health ("WCDOH"); the United States;

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3|30|2017

Teledyne Environmental Inc. ("Environmental") as successor to Isotopes, Inc.; Canrad as successor to Canadian Radium & Uranium Corp.; Westwood Nuclear Corp. as successor to Isotopes, Inc.; the NDL Organization as successor to Nuclear Diagnostics Laboratory, Inc.; Merritt Environmental Consulting Corp. ("Merritt"); DOES 1 through 50 and DOES 51 through 100, in connection with the contamination of real property located at 105 Kisco Avenue, Mt. Kisco, New York ("the Property" or "105 Mt. Kisco"), the purchase of said Property and the operating agreement for an LLC related to the Property.  Before this Court are motions to dismiss filed by Defendants WCDOH, the Village of Mount Kisco/MKURA, Paul Carozza, and Teledyne/Environmental Inc. as successor to Isotopes Inc., and a motion to dismiss or for summary judgment and sanctions by Defendant Merritt.  For the following reasons, Defendant WCDOH's motion is GRANTED in part and DENIED in part, Defendant Village/MKURA's motion to dismiss is GRANTED in part and DENIED in part, Defendant Carozza's motion to dismiss is GRANTED in part and DENIED in part, Defendant Merritt's motion is GRANTED in part and DENIED in part, and Defendant Environmental Inc.'s motion is GRANTED.

## BACKGROUND

The following facts are derived from the Amended Complaint, and unless otherwise noted, and are accepted as true for purposes of this motion.  Given the extensive facts in this case, only those relevant to these motions are included here.

105 Mt. Kisco "has a long history of radiological contamination stemming from the Property's involvement in the Manhattan Project during World War II."  (Am. Compl. ("FAC") ¶ 6, ECF No. 86.)  The Property was first contaminated as a result of the operation of a uranium and radium processing facility (the "Refinery"), which provided the United States with materials to create the first atomic bomb.  (*Id.* ¶¶ 72-74.)  This Refinery, located on and around the Property,

was opened by Defendant Canrad in 1942. (*Id.*) Uranium residues were processed at the Refinery, and "materials recovered at the refinery included radium, radium-D, polonium and actinium, which are all highly radioactive substances." (*Id.* ¶¶ 78-80.) As a result of the "waste inherent in the uranium production processes," radiological contamination was located throughout the Refinery and in other areas. (*Id.* ¶ 85.)

After World War II, Canrad began to produce commercial quality radium and uranium at the Refinery for instruments and other products at the Refinery. (*Id.* ¶ 87.) Throughout the 1940s and 1950s, the government noted "deplorable conditions at the Refinery," which led to high exposure rates among employees. (*Id.* ¶¶ 88-89.) In 1958, Canrad began recovery operations, or clean-up, after the NYSDOH directed it to dispose of radioactive waste originating on the Property, which included multiple recovery operations from 1958 to 1966. (*Id.* ¶¶ 91-92.) However, Canrad failed to decontaminate the Property. (*Id.* ¶ 92.)

In 1966, Defendant MKURA purchased the Property, as well as the adjoining 103 Kisco Avenue, with the intention of rehabilitating it and returning it to the market. (*Id.* ¶¶ 93-94.) MKURA owned and operated 105 Mt. Kisco and oversaw remediation, removal and disposal efforts, including the demolition of the Refinery. (*Id.* ¶¶ 95.) MKURA coordinated with Defendant WCDOH in November 1966 to expedite the demolition of the Refinery and decontamination of the Property, and as a result, released radioactive materials over the Property and contaminated previously clean areas. (*Id.* ¶¶ 95-97.) This release and distribution of radioactive materials occurred because of "grossly negligent demolition of the Refinery, construction of the adjacent Railroad Avenue and disposal of waste from" the Property, carried out by MKURA, WCDOH, "and/or" the Village of Mount Kisco. (*Id.* ¶ 99.) Although, as Plaintiffs allege "at all relevant times," during the demolition and construction the Property was

3

owned and operated by MKURA (*Id*. ¶ 100)  the Village of Mount Kisco arranged for and directed the construction of Railroad Avenue, which further released and dispersed radioactive materials throughout the Property.  (*Id*. ¶ 101.)  Defendant Teledyne ("and/or" Westwood) contracted with MKURA, WCDOH, "and/or" the Village of Mount Kisco to dispose of contaminated material from the former Refinery site.  (*Id*. ¶ 103.)  Teledyne and/or Westwood contaminated the Property when it failed to dispose of large amounts of contaminated soil which was released and spread throughout the Property.  (*Id*.)  Additionally, surveys conducted by WCDOH, NYSDOH, and other entities indicate that residual hot spots of radium existed in parts of the Property even after various attempts to rehabilitate the Property throughout 1970 by MKURA and the Village of Mount Kisco. (*Id*. ¶ 106.)

From the late 1970s onward, local, state, and federal agencies investigated, discovered, and reported on harmful contaminates at the Property.  (*Id*. ¶ 108.)  In 1980, the WCDOH reviewed the Property and confirmed new areas of contamination.  (*Id*. ¶ 109.)  In 1993, the NYSDOH, in coordination with the WCDOH, completed a survey of the Refinery site and identified multiple hot spots that existed throughout the Property.  (*Id*. ¶ 110.)  In 1994, the EPA conducted an on-site inspection to measure radon levels and exposure rates and to collect samples, and observed "elevated" radioactive exposure rates on the Property.  (*Id*. ¶ 111.)  Another report of the Property issued by another governmental entity in 1998 stated that radioactive materials were present in other areas owned and controlled by Carozza and his partner.  (*Id*. ¶¶ 113-116.)  No further state or federal reviews were initiated until 2013.  (*Id*. ¶ 116.)

In 1980, Defendant Carozza began to operate Defendant Richard's Lumber (a lumber and hardware store located on the Property), located on the Property, and owned and operated Richard's Lumber from 1993 until 2012, exercising complete and unfettered control and dominion

over it.  (*Id*. ¶¶ 117-118.)   During the thirty-two years of operation and ownership, Carozza oversaw disposal, release, and removal of radioactive soil and substances from the Property.  (*Id*. ¶ 119.)  Defendants Carozza's and Richard's Lumber's regular disturbance, release, and disposal of radioactive soil further contaminated and damaged the Property.  (*Id*. ¶ 120.)  Defendant Carozza also arranged for the removal of contaminated soil from the Property, further dispersing and releasing radioactive materials throughout the Property as noted in various governmental reports.  (*Id*. ¶ 121.)

In fact, as a result of a 1993 letter from the New York State Department of Environmental Conservation ("NYSDEC"), which identified the possible contamination of the Property, Richard's Lumber commenced a lawsuit against the Village/Town of Mt. Kisco, alleging that the Village failed to disclose the contamination to Richard's Lumber when it negotiated a lease agreement.  (*Id*. ¶ 122.)  During that litigation, Carozza submitted an affidavit, stating that he only learned of the radiation "hot spots" on the Property in 1993, after he had already leased the Property, and that Richard's Lumber would not have leased the Property had it known it could not disturb the soil for the purposes for which it was rented. (*Id*. ¶¶ 123-124.)  Carozza was thus fully aware in 1993 of contamination on the Property.  (*Id*. ¶ 126.)

Additionally, in 1998, Carozza's business partner in Richard's Lumber attended a meeting with members from various governmental entities and the Village of Mt. Kisco to discuss a survey issued that year by the NYSDEC, and possible remediation at the Property.  (*Id*. ¶ 127.)  Plaintiffs allege that Carozza's partner kept Carozza apprised of all information communicated to him at that

meeting by the government agencies regarding the radioactive contamination at the Property.  (*Id.* ¶ 128.)

As to the fraud allegedly committed by Carozza, in late summer 2012, Carozza informed Plaintiff Stagg, who later became Carozza's co-member in 105 Mt. Kisco Associates LLC, that Richard's Lumber was in dire straits because it had defaulted on its mortgage for the Property, and the Local Teamsters Union had outstanding judgments against Richard's Lumber for more than $200,000.  (*Id.* ¶ 133.)  Plaintiffs allege that Carozza "schemed to draw Stagg into a partnership, offload the Property" and satisfy the mortgage and debts, recognizing that Stagg would never purchase property contaminated by radioactive materials.  (*Id.* ¶¶ 135-136.)  Without knowledge of the radioactive contamination, Stagg decided to partner with Carozza.  (*Id.* at 139.)  Together, Stagg and Carozza formed two LLCs, NY Stone and 105 Mt. Kisco Associates, to start a masonry supply business; the former would serve as the operating entity, a masonry and lumber store, and the later would serve as landlord.  (*Id.* ¶¶ 140, 143.)  As part of the agreement, Stagg, acting through his wholly owned LLC, Plaintiffs Amanda's Lane, agreed to purchase the Property from Richard's Lumber and assume the mortgage.  (*Id.* ¶ 141.)  Carozza never divulged information about the radioactive contamination and left Stagg uninformed regarding the hazardous radium and uranium waste at the Property.  (*Id.* ¶ 145.)

In December 2012, Plaintiff Amanda's Lane purchased the Property and assumed the mortgage on the Property.  (*Id.* ¶ 150.)  Stagg personally assumed all responsibility for Richard's Lumber's mortgage loan and guaranteed the Assumption of Mortgage without any guaranty from Carozza or Richard's Lumber, taking on all the loan liability personally.  (*Id.* ¶ 151.)  Later, Stagg, through Plaintiff Amanda's Lane paid $488,326.40 to Defendant Richard's Lumber to satisfy the Teamsters judgment, with some of the funds going directly to Carozza, in order to clear his

partner's debts to start their relationship with a clean slate. (*Id.* ¶¶ 153-154.)  In 2013, Stagg loaned nearly three million to NY Stone to pay for various renovations and modifications both before and after its opening, contributions Stagg never would have made had he known of the radioactive contamination at the Property. (*Id.* at 155-159.)

Later, in 2013, following repeated reports from multiple government agencies for over thirty years, the EPA decided to investigate the Property. (*Id.* ¶ 129.)  In September 2013, EPA investigators commenced an on-site reconnaissance and gamma radiation screening at the Property. (*Id.* ¶ 130.) Plaintiffs were not made aware of this renewed investigation until recently, and were not informed of the contamination until 2015. (*Id.* ¶ 130.)  The EPA found radium contamination at the Property, and that the Property's condition had not changed significantly since 1998. (*Id.* ¶ 131.)

In March 2014, Stagg and Carozza executed an Operating Agreement, an agreement Stagg would never have entered into had Stagg known about the contamination, which included an arbitration clause for certain disputes regarding the Property. (*Id.* ¶¶ 162-165.)  The Operating Agreement does allow, however, for its members to petition a court for injunctive relief. (*Id.* ¶¶ 164-165.)  By allegedly concealing information regarding the contamination on the Property, Carozza breached his fiduciary obligation to Stagg under the agreement. (*Id.* ¶¶ 167-171.)  Indeed, as part of this fraud, Carozza allegedly concealed an investigation of the Property conducted by the EPA in 2013-2014. (*Id.* ¶¶ 164-172.)

From 2012-2014, NY Stone used Stagg's personal funds and issued monthly checks to pay the mortgage on the Property. (*Id.* ¶ 173.)  In 2014, the parties refinanced the mortgage through Bank United ("the Bank"), which sought a Phase I Environmental Assessment. (*Id.* ¶ 175.)  The Bank and Merritt contracted for Merritt to conduct a comprehensive assessment ("Phase I

Report"). (Id. ¶ 176.) Merritt allegedly knew the costs of the assessment would ultimately be borne by 105 Mt. Kisco Associates at closing because it wanted to refinance the mortgage, intended for the agreement to benefit 105 Mt. Kisco as the sole purpose of the assessment was to facilitate the mortgage refinance, knew that its work product would be relied upon, and that the refinancing was contingent upon it. (*Id.* ¶¶ 178-180.)

Pursuant to the Phase I Contract, Merritt agreed that it would be responsible for performing the assessment in accord with the applicable guideline as set forth by the American Society of Testing Materials ("ATSM"). (*Id.* ¶ 181.) The assessment was intended to uncover the presence or likely presence of hazardous substances, but Merritt failed to conduct the assessment in accord with the applicable standards, including failing to interview relevant parties or further investigate the hazardous waste history of surrounding properties. (*Id.* ¶¶ 183-186, 191-199.) Plaintiff alleges Carozza provided false and misleading answers to Merritt in the "Owner's Questionnaire," indicating he had never been informed of the past existence of hazardous substances. (*Id.* ¶ 187.) Plaintiffs allege that if Merritt had conducted a proper investigation, then it would have noted the significant radium and uranium contamination on the property, and history of governmental investigations. (*Id.* ¶ 200.)

In June 2015, the EPA, NYSDEC and NYSDOH met with Plaintiffs to discuss remediation of the Property, and the EPA informed Plaintiffs that it would issue an order directing remediation of the Property. (*Id.* ¶ 20.) To date, Plaintiffs have expended tens of thousands of dollars researching and investigating the extent of radiological contamination, and plan to spend significantly more to fully comprehend and remedy it. (*Id.* ¶ 132.)

## STANDARD ON A MOTION TO DISMISS

Under Rule 12(b)(6), the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id*. at 662. A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## DISCUSSION

### Arguments Relevant to Movants Individually

### I.   Merritt[1]

#### a.   **Negligent Misrepresentation and Breach of Contract**

Plaintiffs allege that Merritt was negligent in its assessment of the Property, made negligent misrepresentations and omissions in its Phase I Report about the history and quality of the land, and that Plaintiffs relied upon the Report in its decision to refinance its mortgage on the Property.

---

[1] The Court addresses arguments made by multiple movants below, *supra* at 34.

(FAC ¶¶ 301, 302, 303.)  Although Bank United contracted Merritt to perform the assessment, Plaintiffs assert that Merritt knew that its work product would be used to inform 105 Mt. Kisco Associates' decision to refinance its mortgage loan on the Property, and that Merritt knew 105 Mt. Kisco Associates would bear the cost of the assessment.  (*Id.* ¶¶ 178-179.)  Defendant contends that Plaintiffs have failed to allege a level of contact between the parties sufficient to approach that of contractual privity, and that Merrit was merely conducting due diligence as part of the Bank's underwriting process for the benefit of the Bank. (*See, e.g.*, Merritt Mem., at 4.)

It is well established that a claim for negligent misrepresentation requires the plaintiff to plausibly allege "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information."  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011) (citing *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007)).  Because no actual contractual relationship exists between the parties, to satisfy the first prong, Plaintiffs must sufficiently allege the establishment of a relationship tantamount to contractual privity. *Ridge Seneca Plaza, LLC v. BP Prod. N. Am. Inc.*, 545 F. App'x 44, 46 (2d Cir. 2013) (summary order) (citing *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 382 (1992)).

To assert that a relationship nearing privity exists, the factual allegations in Plaintiffs' complaint must plausibly allege:  (1) that Merritt was aware its Phase I Report would be used for the particular purpose of informing Plaintiffs' loan refinance decision; (2) that Plaintiffs, a known party to Merritt, relied on the Report in furtherance of its refinance decision; and (3) that there was some conduct by Merritt linking it to Plaintiffs and evincing Merrit's understanding that Plaintiffs would rely on the Report.  *Id.*; *State of California Pub. Employees' Ret. Sys. v. Shearman &*

*Sterling*, 95 N.Y.2d 427, 434 (same).

Plaintiffs' Amended Complaint fails to allege sufficient factual content to indicate that there could have been a privity-like relationship between the parties. Instead, Plaintiffs' Amended Complaint merely concludes that Merritt was aware Plaintiff 105 Mt. Kisco Associates was going to rely on its Phase I Report, that the assessment and subsequent Report were formulated for this purpose, and that Plaintiff relied on the Report to its detriment. (*See, e.g.*, FAC ¶¶ 297, 299; Pl.'s Opp. Re Merritt at 11.) To remedy this deficiency, in their Opposition, Plaintiffs point to the Service Agreement, which is presumably the contract between Merritt and Bank United for the Phase I Report, annexed to Peter Skelos' Declaration in Support of Merritt's Motion, to demonstrate that Merritt was aware of 105 Mt. Kisco Associates, and cognizant that it would rely upon the report. (*See* Pl.'s Opp. Re Merritt at 11.) Specifically, Plaintiffs describe general language in the agreement indicating that Merritt "should" determine if the report is being utilized by Bank United for any transaction, that "all reports completed" should be addressed to Bank United and "the borrower," and a directive that "each report" contain language indicating Bank United "and/or a limited number of investors involved the transaction" may rely upon the report in connection with a planned loan. (*See id*.)[2] Merritt contends that the agreement contains express language limiting the rights in the contract to the parties to the exclusion of third-parties, and that the Phase I Report does not identify any of the Plaintiffs as the "borrower," nor was it addressed to Plaintiffs. (See Merritt Mem. at 6.)[3] The Court notes that the actual Phase I Report, annexed to Plaintiffs' Complaint, does not identify or address Plaintiffs, nor do Plaintiffs allege that it received

---

[2] Plaintiffs argue that it has not been afforded an opportunity to see a full version of the Service Agreement, or to obtain discovery regarding the same, and appear to attempt to reserve the right to challenge whether this document is in fact the agreement between Merritt and the Bank relating to the Phase I Report. (*See* Pl. Mem. Re Merritt at 3) ("Merritt annexed an agreement that it purports is the service agreement related to Phase I conducted at the Property…").)

[3] The cover sheet of the Report states that the Report was "prepared for Bank United". (FAC Ex. D at 1.)

the report from Merritt, or make any representations with regard to how it received the Report for that matter.  (*See* FAC Ex. D.)

The Court need not look outside of the Amended Complaint to determine that Plaintiffs' cause of action for negligent misrepresentation is deficient. Plaintiffs fail to provide factual allegations upon which the Court could conclude that there may have been a privity-like relationship between the parties.  Plaintiffs argue that privity was established by Merritt's "actions in assessing the Property, interviewing individuals,[4] and preparing the Phase I [Report]," (FAC ¶ 307), but fail to elaborate as to the linking connection between Plaintiffs and Merritt.  Linking conduct generally consists of "some form of direct contact between the [the parties], such as a face-to-face conversation, the sharing of documents, or other 'substantive communication' between the parties."  *Sec. Inv'r Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 75 (2d Cir.), *certified question accepted*, 95 N.Y.2d 831(2000), *and certified question answered*, 95 N.Y.2d 702, 746 (2001) (internal quotation marks and citations omitted) (noting the standard for establishing "linking conduct" is "high"); *see CRT Investments, Ltd. v. BDO Seidman, LLP*, 85 A.D.3d 470, 472 (2011) ("the fact that plaintiffs were entitled to and received a copy of the … financial statements, or that [Defendant] knew that the investors would rely upon the information contained in the financial statements, does not establish the requisite linking conduct" for purposes of negligent misrepresentation).  Furthermore, the New York Court of Appeals has refused to permit recovery "by any foreseeable plaintiff who relied on [a] negligently prepared report, and have *rejected even a somewhat narrower rule that would permit recovery where the reliant party or class of parties was actually known or foreseen by the defendants but the individual defendant's*

---

[4] The Court notes that Plaintiffs criticize Defendant due to an alleged *failure to make sufficient contact*, and argues that Defendant was negligent in its assessment because it *failed to speak with more than a single individual*, Defendant Carrozza. (FAC ¶ 186.)

*conduct did not link it to that third party.*"  *Mandarin Trading Ltd.*, 16 N.Y.3d at 181 (citing

*Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 424–25 (1989)

(internal quotation marks) (emphasis added)).  Notably, although Plaintiffs should be able to allege

some factual content with regard to direct conduct "linking" the parties, they do not do so.

    Additionally, the Phase I Report specifically states that the report has been prepared for the

sole use of Merritt's client, the Bank, and that "no other party may use the report without the

written authority" of Merritt, under a section clearly labeled, "Reliance."  (*See* Decl. of Peter

Skelos in Support of Merritt Mot. to Dismiss, Phase I Report, at ¶ 4.2.6, ECF No. 138, Ex. 138-

2).[5] Thus, the very document Plaintiffs rely on undermine their ability to satisfy the reliance prong

necessary to allege that a privity-like relationship exists, and belies Plaintiffs' negligent

misrepresentation claim.  *See Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73

N.Y.2d at 424–25 (collecting caselaw indicating reliance by non-party plaintiff must have been an

"end aim" of the report provided).

    For similar reasons, Plaintiffs also fail to plausibly allege their breach of contract claim,

premised upon their role as "third-party beneficiary."  (*See* Pl. Mem. Re Merritt at 14-16);

*India.Com, Inc. v. Dalal*, 412 F.3d 315, 321 (2d Cir. 2005) (citing *Nepco Forged Prods., Inc. v.*

*Consolidated Edison Co. of N.Y., Inc.,* 99 A.D.2d 508 (2d Dep't 1984)) ("Under New York law,

the effectiveness of a negating clause to preclude third-party beneficiary status is well-established:

'[w]here a provision exists … expressly negating an intent to permit enforcement by third parties,

---

[5] Although portions of the Phase I Report are annexed to the Amended Complaint, Merritt provides the Phase I Report in its entirety.  As the Report is "integral to the complaint … and Plaintiffs assert claims arising directly from [its] terms … the Court may properly consider it on Defendant's motion to dismiss."  *Barbato v. U.S. Bank Nat'l Ass'n*, No. 14-CV-2233 (NSR), 2016 WL 158588, at *5 (S.D.N.Y. Jan. 12, 2016) (internal quotation marks and citations omitted).  This version of the Report identifies the Bank as the entity for which the Report was prepared in at least two places.  (*See* ECF No. 138-2 at 2, 3.)  The undersigned notes that this version is accompanied by an invoice from Merritt to Bank United for a fee in connection with the Report.  (*Id.* at 1.)  Because it is unclear whether this forms part of the Report or stands alone as an independent document, the Court does not rely on this.

... that provision is decisive.'"); *Bd. of Educ. of Northport-E. Northport Union Free Sch. Dist. v. Long Island Power Auth.*, 130 A.D.3d 953, 956 (N.Y. App. Div. 2015) (language expressly negating enforcement by third parties can serve as documentary evidence to refute a third-party beneficiary claim); *see also LaSalle Nat. Bank v. Ernst & Young LLP*, 285 A.D.2d 101, 108, 729 N.Y.S.2d 671 (2001) "[a] non-party may sue for breach of contract only if it is an intended, and not a mere incidental, beneficiary … [and] parties' intent to benefit the third party must be apparent").[6]   The Phase I Report provided by Plaintiffs negates the premise that any of the Plaintiffs were intended third-party beneficiaries.   On these bases, the Court dismisses Plaintiffs' claims for negligent misrepresentation and breach of contract as against Merritt.[7]

## II.   Westchester County Department of Health

### a)   Whether WCDOH Can Be Named as a Party

Defendant WCDOH argues that it cannot be sued because it is a municipal department and "administrative arm" of Westchester County (the "County"), with no legal identity of its own. (*See, e.g.*, Reply Mem. in Support of WCDOH's Mot. to Dismiss ("WCDOH Reply") at 1, ECF No. 112.)   To demonstrate that its status precludes suit, WCDOH directs the Court to the Westchester County Charter § 149.01.   (WCDOH Mem. In Support of Mot. to Dismiss ("WCDOH

---

[6] Plaintiffs' allegations against Merritt stem from the claim that misrepresentations in the Phase I Report led them to refinance the mortgage on the Property in 2014 (*see* FAC ¶¶ 174-180).  Plaintiffs claim that "in … 2014 … plaintiff Stagg and defendant Carozza decided to refinance the mortgage," and as a result, the Bank contracted for Merritt to perform the inspection and analysis leading to the Phase I Report.  (*See id.* ¶ 174)  Though possible Plaintiffs made the preliminary decision to refinance at an earlier date, the Court notes that the Report is dated as having been issued in 2013, which appears to be before the time period when Plaintiffs made the decision to refinance.  (*See* ECF No. 138-2 at 3.)

[7] The Court declines to convert this motion into a motion for summary judgment.  *Finnegan v. Univ. of Rochester Med. Ctr.*, 21 F. Supp. 2d 223, 228 (W.D.N.Y. 1998) ("Because summary judgment is a drastic device, it should not be granted where parties have yet to exercise their opportunity for pre-trial discovery." (internal quotation marks and citations omitted)).  Nor, at this time, will the Court oblige Merritt's request to sanction Plaintiffs.  *See Rothberg v. Phil's Main Roofing, LLC*, No. 14-CV-10195 (NSR), 2016 WL 2344882, at *4 (S.D.N.Y. May 2, 2016) (denying sanctions where "the Court [was] not of the opinion that Defendant's motion was completely without factual and legal basis or definitively made in bad faith"); *see also Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) (stating that "sanctions under Rule 11 are discretionary, not mandatory").

Mem.") at 9, n. 44, ECF No. 109.); WCDOH Reply at 1, n. 3.)  This section establishes the County Department of Health, but does not indicate whether WCDOH is an administrative body exempt from suit.  WCDOH invites the Court to make an inferential leap based upon this citation, with little explanation, but provides no legal argument or case law to argue, for instance, that this language is indicative of the kind barring suit against municipal, administrative entities.[8]

Other sections of the Charter contemplate that County Departments may be named in suits. For example, Chapter 617, Section 194.51 of the Westchester County Charter states "[t]he assignment and transfer of the functions … shall not affect any action or proceeding, civil or criminal, but *the same may be prosecuted or defended in the name of the county or the department to which such assignment is made, and such department shall be deemed substituted as a party…*". *See* "Westchester County Charter," https://www.municode.com/library/ny/westchester_county /codes/code_of_ordinances?nodeId=CHADCOWECO, (last visited on March 25, 2017).[9]  Chapter 617, Section 194.61 states "[a]ll notices of claim, … for the commencement of actions and legal proceedings against the County of Westchester *or any commission, department or bureau thereof* shall be served as provided by law *and all actions or proceedings wherein the County of Westchester or any agency, commission, department or bureau thereof is a party* shall be brought … in the County of Westchester." *Id.*  Furthermore, the Westchester Department of Health has its own, designated website (http://health.westchestergov.com/), a factor considered when determine whether a department is a legal entity separate from the County.  *See Humphrey v. Onondaga Cty. Dep't of Soc. Servs.*, 05-CV-0987, 2008 WL 1945231, at *3 (N.D.N.Y. May 1, 2008) ("counsel

---

[8] Plaintiffs counter with a slew of cases in which various County Departments, including the WCDOH, participated in suits as Defendants.  (See Pl.'s Mem. in Opp. to WCDOH Mot. to Dismiss ("Pl. Mem. Re WCDOH") at 9, ECF No.111.)

[9] *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, No. 14-CV-9783, 2015 WL 5122590, at *7 (S.D.N.Y. Aug. 31, 2015) (stating it is "clearly proper to take judicial notice" of "documents retrieved from official government websites" and that "Courts routinely take judicial notice of such governmental records").

for the County does not … explain how or why the Department is not a viable legal entity. Moreover, review of the … County government's official website reveals a designated page for the Department … Thus, the Court has no basis presently to dismiss plaintiff's claim based on failure to name the proper defendant.").  For these reasons, the Court declines to dismiss Defendant's claim on the basis that WCDOH is an improper party.  It may ultimately be most appropriate to substitute the County for WCDOH in this action, but the Court finds that Plaintiffs' claims are appropriately alleged against WCDOH at this time.[10]

### b) Timeliness of Plaintiffs' Claims

"For cost recovery actions under § 107, CERCLA 'distinguishes between two kinds of response: remedial actions—generally long-term or permanent containment or disposal programs—and removal efforts—typically short-term cleanup arrangements.'"  *MPM Silicones, LLC v. Union Carbide Corp.*, 111-CV-1542 (BKS) (ATB), 2016 WL 3962630, at *11 (N.D.N.Y. July 7, 2016) (citing *Schaefer v. Town of Victor*, 457 F.3d 188, 195 (2d Cir. 2006) (*quoting New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 (2d Cir. 1985)).  The statute of limitations for the recovery of costs incurred in relation to "'removal actions' is three years after the completion of the removal action ... while the limitations period for the recovery of costs related to 'remedial actions' is six years after the initiation of physical on-site construction of the remediation."  *Id.* (citing *Schaefer* F.3d at 195; 42 U.S.C. § 9613(g)(2)).

Both parties appear to acknowledge that remediation and removal efforts consistent with CERCLA, whether successful or not, took place prior to Plaintiffs' involvement with the Property. (*See, e.g.*, WCDOH Mem. at 11, 13; FAC ¶¶ 22, 43, 95.)  Defendant argues that the statute

---

[10] To the extent Westchester County is deemed to be the proper party the County need only be substituted in WCDOH's place.  *Okongwu v. Cty. of Erie*, 14-CV-0832 (WMS), 2016 WL 4678979, at *3 (W.D.N.Y. Sept. 7, 2016) (citing *St. John Rennalls v. County of Westchester*, 159 F.R.D. 418, 419 n. 1 (S.D.N.Y. 1994).)

contemplates that both a remedial and removal action can occur at the same facility, but that courts have generally held there can only be a single remedial and removal action per facility. (*See* WCDOH Mem. at 10.)[11] On this basis, Defendant argues that Plaintiffs' claims for reimbursement under § 107(a), initiated in February 2016, are time-barred. Plaintiffs do not offer a substantive response to this argument, and merely contends that a new statute of limitations runs each time a new party begins removal or remediation actions. (*See* Pl.'s Opp. Re WCDOH, at 12, 14) ("statute of limitations does not begin to run until the private party begins removing or remediating the contamination … that a government agency negligently failed to clean a property years ago does not bar a private party from recovering the costs it incurs to fix that agency's negligence.") Plaintiffs do not cite a controlling case in which one party's initiation of a remedial action was found not to trigger the statute of limitations for another party that engaged in subsequent remedial conduct, nor do Plaintiffs make any additional arguments to support its contention that its remedial claims are not time-barred. (*See* Pl. Opp. Re WCDOH, at 12-15.)

"Distilled to its core, the key distinction between a remedial and removal action is the purpose for which the action is undertaken." *Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 616 F. Supp. 2d 228, 270 (D. Conn. 2009). "Removal actions are generally clean-up measures taken in response to immediate threats to public health and safety," while "[r]emedial actions are typically actions designed to permanently remediate hazardous waste." *N.Y. State Elec. & Gas Corp. v. First Energy Corp.* ("NYSEG"), 766 F.3d 212, 230–31 (2d Cir. 2014) (citing *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1244 (9th Cir. 2005) ("Courts have ... stressed the immediacy of a threat in deciding whether a cleanup is a removal action."); *id.* (citing *Minnesota v. Kalman W. Abrams Metals, Inc.,* 155 F.3d 1019, 1024 (8th Cir.1998) (removal actions are those "taken to

---

[11] Defendant cites two cases from the Sixth and Tenth Circuit, and one case from a Connecticut district court in support of this proposition. (*See* Def's. Mem. at 10.)

counter imminent and substantial threats to public health and welfare"). Removal measures tend

to be shorter in duration and lower in cost than remedial measures, they are also "generally

designed to address contamination at its endpoint and not to permanently remediate the problem."

*Id.*; *see MPM Silicones, LLC*, 2016 WL 3962630, at *12 (citing *NYSEG*, 766 F.3d at 233 ("[T]he

2004 cleanup has already taken several years and cost over $29 million, with costs expected to rise

to $54 million. This is in keeping with a remedial, rather than removal, action.").

As to the number of remedial and removal actions that can occur at a single facility, the

Second Circuit has held:

> We agree with the majority view and hold that there can only be one
> remedial action at a site. The very nature of a remedial action is to
> permanently remediate hazardous waste ... A remedial action is
> supposed to be a final, once-and-for-all cleanup of a site, and once
> a PRP completes an approved remediation plan, it would not be
> logical—or fair—to subject that entity to additional CERCLA
> lawsuits seeking yet additional permanent relief, although we
> recognize that what seems final at a given point in time might come
> to appear inadequate at a later date as scientific knowledge
> progresses.

*NYSEG*, 766 F.3d at 236 (collecting cases). Thus the Second Circuit has barred suits to recover

costs for subsequent remedial work at facilities where previous remedial work was initiated more

than six years prior to the lawsuit. *Id.*[12]

Additionally, in a suit before another district court in this Circuit, where a *subsequent*

owner had argued that a previous party's actions could not trigger the statute of limitations for any

remedial work that party might engage in, the court found that the statute of limitations did in fact

---

[12] In contrast, the Second Circuit explicitly "express[ed] no view [and took no position] as to whether there may only
be one removal action under CERCLA." *NYSEG*, 766 F.3d at 236, n. 19. On a separate note, to the extent Plaintiffs
attempt to imply that this rule differs when governmental as opposed to private entities are involved – though they
make no argument to this effect – the Court is not aware of such a distinction, nor do Plaintiffs direct the Court to any
legal citation indicating as such. *See* Pl's. Opp. Re WCDOH, at 12, 14) ("that a government agency negligently failed
to clean a property years ago does not bar a private party from recovering the costs it incurs to fix that agency's
negligence.")

begin to run when the prior owner commenced remedial action, and that the plaintiff's claims to recover response costs for their own remedial actions would be barred by the statute of limitations. *see MPM Silicones, LLC*, 2016 WL 3962630, at *14 ("The Court agrees that following *NYSEG*, the statute of limitations began to run when the prior owners commenced physical on-site construction of the remedial action, and [new owner's] CERCLA claim for remedial costs is time-barred.")

Plaintiffs do not indicate whether it has, or plans to engage in remedial or removal actions. (*See* Pl. Opp. Re WCDOH at 12-15; *see id*. at 14 ("Plaintiffs sued … well within the three or six year statute of limitations").)  Nor can the Court discern the nature of Plaintiffs' conduct at this stage, whether categorically "remedial" or "removal" in nature.  However, prevailing law indicates that there can only be a single remedial action per facility, and the statute of limitations to recover for that action began six years after its initiation. *See* 42 U.S.C. § 9613(g)(2).  As to remedial work previously engaged in at the Property beginning in the 1960s (*see, e.g*., FAC ¶¶ 94-95) (describing remediation efforts), the statute of limitations clearly ran long before this action was commenced. Thus, any claims alleged to recover response costs for remedial actions are barred under the statute of limitations delineated in CERCLA § 107, and are dismissed with prejudice.

### c) WCDOH's Claims of Immunity

#### 1. Eleventh Amendment Immunity

Defendant argues that because it was acting "at the behest of the State" the Eleventh Amendment immunity "should be extended" to bar Plaintiffs' suit against Defendant "in this narrowly tailored instance."  (*See, e.g*., WCDOH. Mem. at 14; WCDOH Reply at 5.)

Defendant has identified itself as a "municipal corporation."  (*See* WCDOH Mem. at 8-9.) Caselaw cited by WCDOH itself demonstrates that there is no blanket immunity for such an entity,

nor does WCDOH direct the Court's attention to any case law in which a similarly situated entity was granted immunity in the context of CERCLA for the work WCDOH allegedly performed here. (WCDOH Mem. at 15) (citing *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198–99 (2d Cir. 1992) ("[I]t is clear that a municipality may be liable as a potentially responsible party if it arranges for the disposal of hazardous substances. CERCLA expressly includes municipalities, states, and other political subdivisions within its definition of persons who can incur such liability under § 9607 …. [E]xpress exceptions to liability are strong evidence that municipalities are otherwise subject to CERCLA liability … To construe CERCLA as providing an exemption … simply because the municipality undertakes such action in furtherance of its sovereign status would create an unwarranted break in the statutory chain of responsibility."); *see AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 447 (2d Cir. 2009) ("state and local governments remain liable under § 9607(a) for actions *other* than those involving emergency responses."); *see also N. Ins. Co. of N.Y. v. Chatham Cty., Ga.*, 547 U.S. 189, 189 (2006) ("sovereign immunity does not extend to counties … even when they "exercise a 'slice of state power'") (internal citations omitted); *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 243 (2d Cir. 2006) ("Eleventh Amendment immunity does not extend to a "municipal corporation," ... or a "political subdivision" of the state .... or "units of local government, such as cities and counties").[13]

WCDOH also argues that it should not be held liable because its actions were akin to instances where the "governmental unit [was] responsible only for promulgating disposal regulations or … permitting disposal facilities;" activity that Defendant contends has been found to present insufficient "nexus" "between the municipality and the hazardous substances" to hold

---

[13] On reply, WCDOH provides no substantive response to Plaintiffs' argument that it has described itself as a municipal corporation, and that such entities are not covered under the Eleventh Amendment, and instead, merely reiterates the points made in its initial memorandum. (*See* Pl. Opp. Re WCDOH at 16; WCDOH Mem. at 5.)

such an entity liable.  (WCDOH Mem. at 15.)  It would be inappropriate for the Court to make a determination as to the nature and bounds of WCDOH's actions at this stage.

Nor is the Court persuaded by Defendant's argument that it should not be held liable pursuant to CERCLA's emergency response provision, 42 U.S.C. § 9607(d)(2).  (*See* WCDOH Mem. at 15.)  Plaintiffs do not allege that Defendant acted in response to an emergency.  (*See* Pl. Mem. Re WCDOH at 18.)   Nor, in its initial memorandum, does Defendant point to any documents attached to Plaintiffs' Amended Complaint to indicate it acted in the context of an emergency. (See Def's. Mem. at 15-17); *see AMW Materials Testing, Inc.*, 584 F.3d at 448 (citing *East Bay Mun. Util. Dist. v. U.S. Dep't of Commerce*, 142 F.3d 479, 483 (D.C.Cir. 1998) ("§ 9607(d)(2) 'gives state and local governments *a partial defense against claims arising from their emergency remediation efforts*, limiting their liability to cases of gross negligence or intentional misconduct'") (emphasis added)). In its Reply, Defendant does appear to argue that it acted in the context of an "environmental emergency" but provides no parenthetical to accompany a citation that appears inapposite.  (*See* WCDOH Reply at 5.)[14]  Plaintiffs plausibly allege that WCDOH engaged in the kind of activity that would incur liability under CERCLA.  Because WCDOH has provided no persuasive justification to dismiss Plaintiffs' claims, the Court declines to do so.

---

[14] On a separate note, the Court must reject WCDOH's apparent contention that because Plaintiffs allege WCDOH surveyed the premises of the Site, WCDOH has established *by a preponderance of evidence* that it "exercised due care in address the hazardous substance" and is thus exempt from liability under 42 U.S.C. § 9607(b).  WCDOH fails to provide a legal citation to support this proposition, nor does it explain how the Court could make such a determination at this juncture.  (*See* WCDOH Mem. at 17 (citing 42 U.S.C. § 9607(b) ("There shall be no liability under subsection (a) of this section for a person otherwise liable who can *establish by a preponderance of the evidence* that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by … an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant … *if the defendant establishes by a preponderance of the evidence that* (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance…")).

### III.    MKURA and Village of Mount Kisco

a) MKURA

Plaintiffs choose not to address Defendants' arguments that all claims against MKURA must be dismissed because it lacks the capacity to be sued, and instead, focuses on the contention that Plaintiffs have plausibly alleged successor liability against the Village of Mount Kisco.  (*See* Village of Mount Kisco/MKURA Mem. in Support of Mot. to Dismiss ("Village/MKURA Mem.") at 7-8, ECF No. 116; *see generally* Pl.'s Mem. in Opp. to Village/MKURA's Mot to Dismiss ("Pl. Opp. Re Village/MKURA"), ECF No.118).   Plaintiffs' choice not to oppose Defendants' arguments with regard to MKURA are deemed purposeful, and all claims against MKURA individually are considered abandoned.  *See Tuman v. VL GEM LLC*, No. 15-CV-7801 (NSR), 2017 WL 781486, at *7–8 (S.D.N.Y. Feb. 27, 2017) (citing *Westchester Cty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 618 (S.D.N.Y. 2015) ("abandonment constitutes an[ ] independent ground for dismissal")).

b) Successor Liability

Plaintiffs contend that Defendant Village has "succeeded to or otherwise assumed the liabilities of Defendant MKURA."  (FAC ¶ 50.)  Defendants Village/MKURA argue that because the Legislature dissolved MKURA without transferring its obligations or liabilities to the Village, and Plaintiffs fail to allege sufficient facts for the Court to infer an exception to the general rule that the acquisition of one business's assets by another business does not result in successor liability, Plaintiffs' claims of successor liability against the Village must fail.  (Village/MKURA Mem. at 12.)

In 1964, MKURA was created pursuant to New York General Municipal Law ("GML") § 577 as a "body corporate and politic," composed of the "village mayor … and four village

trustees."  *See* Affidavit of Whitney Singleton in Support of Motion to Dismiss ("Singleton Affidavit"), Ex. G, N.Y. Gen. Mun. Law § 577);[15] *see also* N.Y. Gen. Mun. Law § 553 (a "[municipal urban renewal] agency shall be a corporate governmental agency, constituting a public benefit corporation").  As an urban renewal agency MKURA had the capacity to: "to sue and be sued; … to make and execute contracts and all other instruments necessary or convenient for the exercise of its powers and functions; … to appoint officers, agents and employees, prescribe their duties, fix their compensation and delegate to one of more of such officers, agents or employees such powers or duties as it may deem proper; … [and,] with the consent of the municipality to use agents, employees, and facilities of the municipality, paying to the municipality its agreed proportion of the compensation or costs."  N.Y. Gen. Mun. Law § 554.

In 2012, the New York Legislature repealed MKURA through Chapter 373 of the Laws of 1971, and declared that "any existing records, property, rights, titles and interest … shall vest in and be possessed by the village of Mount Kisco and its successor and assigns."  *See* Singleton Affidavit, Ex. H. at 3, § 12); 2011 Bill Text NY A.B. 8823.  As WCDOH notes, though the Legislature transferred "obligations and liabilities" of industrial development agencies repealed by the same legislation to their respective municipalities, it declined to transfer MKURA's obligations and liabilities to the Village.  (*See id*., §§ 154-190.)  Aside from this omission, the language in many of the sections repealing other agencies is essentially identical to that of the section repealing MKURA.[16]

"'CERCLA encompasses successor liability,' which is governed by federal common law." *N.Y. v. Town of Clarkstown*, 95 F. Supp. 3d 660, 682 (S.D.N.Y. 2015) (citing *New York v. Nat.*

---

[15] The Court may take judicial notice of public information.  *See Pub. Employees' Ret. Sys. of Mississippi v. Goldman Sachs Grp., Inc.*, 09-CV-1110 (HB), 2011 WL 135821, at *1 n.1 (S.D.N.Y. Jan. 12, 2011).
[16] Plaintiffs do not take issue with these contentions as set forth by WCDOH.

*Serv. Indus., Inc.*, 460 F.3d 201, 206 (2d Cir. 2006)).  According to "both New York and traditional common law, 'a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities.'"  *Id.* (citing *Nat. Serv. Indus., Inc.*, 460 F.3d at 209.)  However, a buyer of a corporation's assets can be held liable as its successor under one of the following exceptions: "(1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *Id.* (internal quotation marks omitted)."  Thus, "to state a claim based on successor liability, a *plaintiff must plead enough facts for the Court to infer that one of the exceptions to "the general rule finding that a business entity acquiring the assets from another business generally results in no successor liability*."  *Id.* (emphasis added).

Plaintiffs assert the second exception applies, and that the dissolution of MKURA was "really a de facto consolidation or merger of MKURA and the Village."  (*See* Pl's. Opp. Re Village/MKURA, at 11-12.)  To this end, Plaintiffs claim that MKURA was made up of members of the Village Board of Trustees and the Village mayor, and was eventually dissolved because its responsibilities were redundant to that of the Village.  (*See id.* at 11.)  Thus, Plaintiffs argue that the entities are one in the same, and that upon dissolution, the Village acquired MKURA's responsibilities and tasks.  (*See* Pl. Opp. to Village, at 12-13.)  As support, Plaintiffs cite the minutes to the meetings held by the Village Board of Trustees, during which individuals such as the Mayor and Village Attorney state that the "Village/Town Board is the Urban Renewal Board." (*See id.* at 12.)

The "hall-marks" of a de facto merger are: "(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption

by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." *N.Y. v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006). The first element, continuity of ownership "'is designed to identify situations where the shareholders of a seller corporation retain some ownership interest in their assets after cleansing those assets of liability.'" *City of Syracuse v. Loomis Armored US*, LLC, 900 F. Supp. 2d 274, 288–89 (N.D.N.Y. 2012) (citing *New York v. National Service Indus., Inc.*, 460 F.3d 201, 211 (2d Cir. 2006); *id.* at 289 ("Where one corporation purchases another corporation's assets, a continuity of ownership exists where the predecessor corporation's shareholders become direct or indirect shareholders of the successor corporation."); (*see also* Pl. Opp Re Village/MKURA at 10 (citing caselaw for the proposition that CERCLA liability is established where corporation *purchased assets of entity*).) This element has been recognized by the Second Circuit as the "'essence of a merger' and thus a necessary predicate to a finding of a de facto merger" in New York. *Nat'l Serv. Indus., Inc.*, 460 F.3d at 212.

Neither Plaintiffs' complaint nor opposition papers allege any factual allegations with regard to continuity of ownership, or explain how the law applies to Plaintiffs' circumstances in this context. While Plaintiffs may assert factual allegations in relation to the second and fourth elements – dissolution, and continuity of management[17] and business operations[18] – the Second

---

[17] Courts in this district have recognized agencies created under the GML to be "separate and distinct entities" with existences independent of the municipalities in which they operate, despite the fact that their members consist of the town supervisors and councilmen by statutory design. *Field Day, LLC v. Cty. of Suffolk*, 799 F. Supp. 2d 186, 193 (E.D.N.Y. 2011); *see also New York State Comptroller*, 1978 WL 4811, at *1 ("As a general proposition, a sponsoring municipality is not liable for debts and liabilities incurred by an urban renewal agency, although such a municipality may agree to make itself so liable .... It then follows that as a general proposition, the agency itself and not the sponsoring municipality would be primarily liable for debts and liabilities incurred by the agency.") Under these circumstances, it is unclear whether overlap in membership alone would suffice to satisfy the "continuity of management" element. However, the Court need not decide, as the claim is insufficient as pled.

[18] As to continuity of business operations, also part of the fourth element of a de-facto merger, Plaintiffs argue both that the entities performed the same task and were thus redundant, and that the Village assumed MKURA's

Circuit has found this insufficient to support a claim of *de facto* merger.  *See Priestley v. Headminder, Inc.*, 647 F.3d 497, 506 (2d Cir. 2011) (allegation regarding "continuity of … officers," without sufficient facts to allege continuity of ownership is insufficient to support claim of *de facto* merger).  For these reasons, Plaintiffs' claims against the Village arising out of successor liability are dismissed.

## IV.   Teledyne/Environmental Inc.

### a)  Successor liability

Defendant Environmental Inc., formerly known as Teledyne Environmental, Inc. ("Environmental Inc."), correctly notes that the only allegation purporting to establish that it is a successor to Isotopes, Inc. reads as follows:

> Upon information and belief, based on official state records, *defendant Teledyne, as successor to Isotopes, Inc.,* was and is a duly organized foreign corporation doing business and/or transacting business in the State of New York and/or should have expected its acts to have consequences within the State of New York. At all times relevant, Teledyne, by contract, agreement or otherwise, arranged for the removal and transport of hazardous materials to and from the Mt. Kisco Property.

(FAC ¶ 57; *see* Environmental, Inc. Mem. In Support of Mot. to Dismiss ("Environ. Mem.") at 4, ECF No.129.)[19]  Thus, the Amended Complaint fails to plead any facts that would "allow the Court to infer that one of the exceptions to the general rule finding that a business entity acquiring the assets from another business generally results in no successor liability," and instead, proffers only a single, bare, conclusory allegation to support the contention that Environmental Inc. is liable as successor to Isotopes, Inc.  *Clarkstown*, 95 F. Supp. at 682; *see also id.* at 660 (mere allegation

responsibilities.  To the extent the entities were redundant, it follows that the Village merely continued to perform the same tasks it had performed previously, and a dissolved MKURA would no longer be able to engage in duplicative work.  Though Plaintiffs' arguments may border on contradiction, drawing all reasonable inferences in favor of Plaintiffs at this stage, the Court assumes Plaintiffs argue that the Village assumed tasks and responsibilities previously belonging solely to MKURA.

[19] Plaintiffs effectively concede this point, and do not attempt to cite additional allegations in their Amended Complaint they believe bolster this claim.

that party is successor to another entity, "standing alone, is insufficient for the Court to infer that the general rule governing successor liability does not apply").

To correct this deficiency, Plaintiffs argues that the third exception to the general rule governing successor liability – that the purchasing corporation was a mere continuation of the selling corporation – applies. (*See* supra at 24 identifying the four exceptions to the general rule precluding successor liability where entity purchases assets of another entity); *see also* Pl. Mem. in Opp. to Environ. Mot. to Dismiss ("Pl. Opp. Re Environ.") at 3, ECF No. 131.)  According to Plaintiffs, under this exception the "'substantial continuity' theory … is often applied," and should presumably be applied here. (Pl. Opp. Re Environ., at 12-13.)  In this vein, Plaintiffs ignore what has now been well-established for a decade – "the substantial continuity doctrine … is no longer good law" and "cannot be applied to determine successor liability under CERCLA." *N.Y. v. Nat'l Servs. Indus., Inc.*, 352 F.3d 682, 683, 687 (2d Cir. 2003).  Instead, to plead that one entity is a "mere continuation" of another, Plaintiffs must plausibly allege sufficient facts for the Court to infer that "'it is not simply the business of the original corporation which continues, but the corporate entity itself and there is a common identity of directors, stockholders, and the existence of only one corporation at the completion of the transfer." *Martin Hilti Family Trust v. Knoedler Gallery*, LLC, 137 F. Supp. 3d 430, 457–58 (S.D.N.Y. 2015) (internal quotation marks and citations omitted); see *Nat'l Servs. Indus., Inc.*, 352 F.3d at 685 (finding "mere continuation" based upon "the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations."); *see Martin*, 137 F. Supp. 3d at 458 (plaintiff plausibly alleged "mere continuation" where management remained the same, and "predecessor entity transferred not only its assets, but also its business location, employees, management, and good will to the successor."); *Societe Anonyme Dauphitex*

*v. Schoenfelder Corp.*, 07-CV-489, 2007 WL 3253592, at *5-7 (S.D.N.Y. Nov. 2, 2007) (plaintiff sufficiently alleged "mere continuation" where predecessor and successor company had shared office space, an address, employees and management, and where it was logical to infer that the successor company was created to avoid contractual liability).  Neither Plaintiffs' sole allegation that "Environmental Inc. [is a] successor to Isotopes," (*see* FAC ¶ 57), nor Plaintiffs' contention that "Isotopes became what is now known as Environmental Inc. … through a number of name changes and mergers," (*see* Pl. Opp. Re Environ., at 13) or related arguments, are sufficient to establish a plausible claim for successor liability.[20]  Because Plaintiffs fail to plausibly allege that Environmental is successor to Isotopes, and the CERCLA claims against Environmental appear to be alleged against it only in the role as successor, all claims against Environmental Inc. are dismissed.  (*See* Pl. Mem. Re Environ. at 9, 11, 12) (indicating CERCLA claims against Environmental Inc. arise out of its alleged role as successor).

## V.   Defendant Paul Carozza

### a)  Whether Plaintiffs Stagg & Amanda's Lane Have Standing Under CERCLA

Defendant contends that Plaintiffs Stagg and Amanda's Lane lack standing under CERCLA because they have no ownership interest in the Property and Plaintiffs fail to plausibly allege that either of these entites are involved in paying response costs.  (*See* Carozza Opp. at 14.)

"To establish standing, a plaintiff must show three elements: (1) that it has suffered injury-in-fact; (2) that the defendant's complained-of conduct caused such injury-in-fact; and (3) a

---

[20] Plaintiffs contends that this claim, though insufficiently alleged, should survive because a successor liability claim is subject to the more lenient pleading requirement delineated in Federal Rule of Civil Procedure 8(a), (*see* Pl. Mem. Re Environ. at 11), and Plaintiffs should be permitted to engage in discovery to "confirm which entity bears Isotopes' successor liability (*see id*. at 15)."  These arguments are unavailing.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) ("Rule 8 … does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *see also id*. at 686 (holding that where complaint fails pleading requirements, plaintiff "is not entitled to discovery, cabined or otherwise"); *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 567 (2d Cir. 2016) (a plaintiff who has failed adequately to state a claim is not entitled to discovery).

likelihood that the relief requested will redress the plaintiff's claimed injury." *Solvent Chem. Co. ICC Indus. v. E.I. Dupont De Nemours & Co*., 242 F. Supp. 2d 196, 217 (W.D.N.Y. 2002) (citing *Steel Co. v. Citizens for a Better Envt.,* 523 U.S. 83, 103–04 (1998)).

Plaintiffs allege that Amanda's Lane (Stagg's wholly owned LLC) purchased and assumed the mortgage on the Property on December 21, 2012, and that Stagg personally assumed all responsibility for Richard's Lumber's mortgage loan and guaranteed the Assumption of Mortgage without any guaranty from Carozza or Richard's Lumber "thereby personally taking on all of the loan liability." (FAC ¶¶ 141, 150, 151.) Plaintiffs further allege that they have undertaken and will continue to undertake investigations and response actions in connection with the Property to address releases or threatened releases of hazardous substances and will continue to incur those costs recoverable under CERCLA. (FAC ¶ 231.) Because Plaintiffs are "seeking to recover costs associated with the cleanup of the site," they can recover damages under CERCLA, and their allegations are thus sufficient to confer standing. *See Wademan v. Concra*, 13 F. Supp. 2d 295, 302 (N.D.N.Y. 1998) (denying standing under CERCLA where Plaintiffs were "not seeking to recover the costs associated with the cleanup of the site" and had failed to allege injury that could be "redressed by a favorable decision".)

### b) Plaintiffs' Claim for Equitable Estoppel

Carozza argues that Plaintiffs' claim for equitable estoppel should be dismissed because such a claim is not a cause of action, and cannot form the basis for a recovery of damages. (*See* Carozza Mem. at 15.) On Reply, Carozza appears to abandon this argument, and contends that Plaintiffs fail to plausibly allege an equitable estoppel claim.

As Plaintiffs point out, the Second Circuit does appear to recognize equitable estoppel as a claim under New York law. *Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993) (finding "facts

are insufficient to support a claim for equitable estoppel" in ERISA context); *Sabilia v. Richmond*, 11-CV-739 (JPO) (MHD), 2011 WL 7091353, at *30 (S.D.N.Y. Oct. 26, 2011), *report and recommendation adopted*, 11-CV-739 (JPO), 2012 WL 213656 (S.D.N.Y. Jan. 24, 2012) (recommending dismissal of equitable estoppel claim where plaintiffs sought only money damages and did "not seek to preclude defendants from asserting any right, privilege, defense, or claim, or from engaging in certain conduct."); *see also Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 724 F. Supp. 2d 407, 419 (S.D.N.Y. 2010) (listing elements that must be pled to assert equitable estoppel claim) (internal citations omitted).   "The elements of estoppel are (1) material representation, (2) reliance and (3) damage." *Lee*, 991 F.2d at 1009.

In support of this claim, Plaintiffs allege that Carozza actively concealed the Property's radioactive contamination from Plaintiffs, which, if known, "would have changed [Plaintiffs'] position and prevented them from … purchasing the Property," (Pl. Mem. in Opp. to Carozza at 12; *see, e.g.*, FAC ¶¶ 135-137, 139, 146-149), that, if not for Carozza's misrepresentations,[21] "Plaintiffs would not have entered into a partnership with him … paid off his … debts, … purchased the contaminated Property, assumed the Mortgage, personally guaranteed the Mortgage or put hundreds of thousands of dollars towards building a masonry business on the Property," (Pl. Mem. in Opp. to Carozza at 13; *see, e.g.*, FAC ¶¶ 136-137, 146-149, 159, 165, 171), and that "Plaintiffs have and will continue to suffer damages as a result of Carozza's fraudulent concealment of the contamination," (*see* Pl. Mem. in Opp. to Carozza at 13; *see, e.g.*, FAC ¶ 132, 154.)  Furthermore, Plaintiffs seek not just monetary, but also declaratory and injunctive relief. (*See* FAC ¶ 2.)  Thus, at this stage, Plaintiffs have plausibly asserted equitable estoppel.

---

[21] At this stage, Plaintiffs have plausibly alleged that Carozza's failure to disclose the contamination on the Property was a material misrepresentation.

### c)  Claims Subject to Arbitration

Carozza asserts that Plaintiffs' "state law claims" arising out of the Operating Agreement between Stagg and Carozza (as members of 105 Mt. Kisco Associates LLC) (*see* FAC Ex. O "Agreement"), for rescission of the agreement based upon fraudulent inducement (FAC ¶¶ 248-254), damages based upon fraudulent inducement (*id*. ¶¶ 255-265), unjust enrichment (id. ¶¶ 266-274), and money had and received (*id*. ¶¶ 275-283) should be dismissed under Rule 12(b)(3) on the basis that the Court lacks venue to adjudicate these claims because they are governed by a binding arbitration agreement.  (*See* Carozza Mem., at 17.)

As articulated by the Second Circuit, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration … Accordingly, federal policy requires us to construe arbitration clauses as broadly as possible."  *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (internal quotation marks and citations omitted).  To this end, in deciding whether claims are subject to arbitration, the Circuit Court has established a two part test, which requires consideration of the following: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement."  *Id*. (internal citations omitted).

The Operating Agreement in the instant action was designed in part to set forth "the agreement of the parties about their respective rights and duties as parties to the Agreement and about the …LLC" formed by Carozza and Stagg (105 Mount Kisco Associates LLC).  (FAC Ex. O at 1.)  As provided by the Agreement, "the principal purpose of the LLC [was] … to own, operate and develop real property located at" the Property.  (*Id*.)  The Agreement contains a mandatory arbitration clause which provides as follows:

> If any dispute arises among the members under or relating to this Agreement or relating to the LLC's business or internal affairs that the members cannot resolve

> voluntarily among themselves or by meditation under Section 26, then, unless the members decide otherwise by unanimous vote at the time, they shall resolve the dispute by arbitration …. the rules governing any arbitration under this Section 27 shall be the AAA's Commercial Arbitration Rules … For purposes of this Section 27, arbitral matters shall compromise the following types of matters:  (a) <u>Scope, Construction and Enforcement of This Section, Etc.</u>[:] [a]rbitral matters shall include matters concerning the scope, construction and enforcement of this Section; (b) <u>Matters Involving Material Interests of the LLC or the Members</u>[:] [a]rbitral matters shall include material matters that arise under or relate to this Agreement or to the internal affairs of the LLC.

Agreement at 43-44.

Plaintiffs do not challenge the validity of the arbitration clause.  In fact, Plaintiffs attempt to assert rights under the mandatory arbitration section as well,  (See Pl. Opp. Re Carozza at 16),[22] and there is no indication this agreement to arbitrate is invalid.  *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 127 (citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford, Jr. Univ.,* 489 U.S. 468, 479 (1989); *S.A. v. AnimalFeeds Int'l Corp.*, 130 S.Ct. 1758, 1774 (2010)) ("Arbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit … As with any other contract, the parties intentions control.").  As to the scope of the Agreement and whether it encompasses Plaintiffs' claims, the Court finds that the parties consented to the arbitration of Stagg's claim for rescission of the Operating Agreement due to fraudulent inducement; a dispute encompassed by the arbitration provision as a "material matter[] aris[ing] under [or in] relat[ion] to th[e] Agreement."  *See Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 61 (2d Cir. 2012) (internal quotation marks and citations omitted) ("challenges to a contract containing an arbitration clause fall into two categories: those that challenge the contract as a whole, and those that challenge the arbitration

---

[22] Plaintiffs argue that arbitral claims can be pursued in Court pursuant Section 27.5 of the Agreement, which provides "notwithstanding any other provision of this Agreement, any member may bring suit in a court … to petition a court for injunctive relief with respect to a matter arising under or relating to the Agreement or relating to the LLC." (*See* Pl. Opp. Re Carozza at 16; Agreement at 44.)  However, Plaintiffs' Amended Complaint fails to specify the basis for the request for such relief.

clause in particular" … [the FAA,] however, "does not permit the federal court to consider claims of fraud in the inducement of the contract generally."). *See Arrigo v. Blue Fish Commodities, Inc.*, 408 F. App'x 480, 482 (2d Cir. 2011) (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 440 (2006) ("'unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.'").

However, the remaining claims Carozza seeks to have dismissed in favor of arbitration appear to be claims brought by Plaintiff Amanda's Lane, a non-signatory to the Agreement. These claims include a cause of action for the rescission of Amanda's Lane's purchase of the Property based upon fraudulent inducement; for unjust enrichment in relation to Amanda's Lane's satisfaction of Defendant Richard's Lumber's mortgage loan; and for "money had and received" in connection with the payment of the mortgage loan. (*See* FAC ¶¶ 255-279.) Carozza invites the Court to find that Amanda's Lane is bound to the terms of the Agreement, and thus required to arbitrate the aforementioned claims, on the basis that Amanda's Lane is Plaintiff Stagg's alter ego, agent, or a beneficiary of the Agreement. (*See* Carozza at 19-21.) As an initial matter, when the arbitration clause contains language indicating it is designed to encompass disputes between signatories (or "members") only, as the clause in question does here, the provision is generally found not to encompass disputes involving non-signatories. *See Trade Arbed, Inc. v. M/V KANDALAKSHA*, 02-CV-5121, 2003 WL 22097460, at *3 (S.D.N.Y. June 23, 2003) ("narrow arbitration clauses which provide that 'disputes between owners and charterers' must be arbitrated generally apply only to disputes between the particular parties identified in the clause."); *cf Limonium Mar., S.A. v. Mizushima Marinera, S.A.*, 201 F.3d 431 (2d Cir. 1999) ("the nonsignatory still cannot be compelled to arbitrate unless the arbitration clause itself contains language broad enough to allow nonsignatories disputes to be brought within its terms.") (internal quotation marks

and citations omitted).

While it may ultimately be most efficient and perhaps appropriate for Amanda's Lane to arbitrate its "state claims" along with Plaintiff Stagg, at this early stage of litigation, the Court does not have enough information to make a determination as to the relationship between Stagg and Amanda's Lane. *See, e.g.*, *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. A & M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.*, 314 F. Supp. 2d 332, 347 (S.D.N.Y. 2004) ("When considering whether a party is the alter ego of a signatory … the court weighs a number of different factors, no single one of which is dispositive, including whether the two entities have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership) (internal quotation marks and citations omitted).  Nor does Carozza specify the direct benefit it believes was confirmed upon Plaintiff through the Agreement, not to mention that the Agreement explicitly indicates there are no third-party beneficiaries.  (*See* Carozza Mem. at 21.)

Thus, at this stage, the Court dismisses Plaintiffs' fifth cause of action for recession of the Operating Agreement due to fraudulent inducement as against Defendant Carozza, without prejudice, in favor of arbitration.

<u>Arguments Applicable to Multiple Movants</u>

## VI.    Movants as Potentially Responsible Parties Under CERCLA

"CERCLA attempts to provide for the cleanup of hazardous substances and imposes strict liability upon responsible persons for the costs of responding to a release or a threatened release of such substances."  *Atl. Richfield Co. v. Current Controls, Inc.*, 93-CV-0950, 1996 WL 528601, at *5 (W.D.N.Y. Sept. 6, 1996).  "[T]o [plead] a prima facie case of liability, a plaintiff must [allege] that (1) the site is a 'facility' as defined in CERCLA, (2) a release or threatened release of

a hazardous substance has occurred, (3) the release or threatened release has caused the plaintiff

to incur response costs that were necessary and consistent with the National Contingency Plan set

up by CERCLA, and (4) the defendants fall within one or more of the four classes of responsible

persons described in CERCLA § 107(a)." *Freeman v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 163

(2d Cir. 1999).  As discussed below, WCDOH, Carozza, the Village, and  WCDOH contend that

Plaintiffs have failed to plausibly allege the fourth factor against them; that they fall within one of

the categories of responsible and thus liable parties.

CERCLA §107(a), 42 U.S.C. § 9607(a), imposes liability upon the following four classes

of responsible parties: "(1) the owner and operator of a vessel or a facility; (2) any person who at

the time of disposal of any hazardous substance owned or operated any facility at which such

hazardous substances were disposed of; (3) any person who by contract, agreement, or otherwise

arranged for disposal or treatment, or arranged with a transporter for transport for disposal or

treatment, of hazardous substances owned or possessed by such person, by any other party or

entity, at any facility or incineration vessel owned or operated by another party or entity and

containing such hazardous substances; and (4) any person who accepts or accepted any hazardous

substances for transport to disposal or treatment facilities, incineration vessels or sites selected by

such person, from which there is a release, or a threatened release which causes the incurrence of

response costs, of a hazardous substance...."  42 U.S.C. § 9607(a).

### a)  Owner Liability

To assert a claim for owner liability under CERCLA, a plaintiff must allege that (1) the

defendant is an 'owner' under 42 U.S.C. § 9607(a)(1) or (2).  *See Next Millennium Realty, LLC*,

160 F. Supp. at 504–05 (E.D.N.Y. 2016).  "Section 9607(a)(1) applies to all current owners and

operators, while [S]ection 9607(a)(2) primarily covers prior owners and operators."  *See id*.

Owners of the property where the release took place can be held under § 107(a), regardless of any control or lack of control over the disposal activities.  *See, e.g.*, *Monsanto,* 858 F.2d at 169.

### 1.  Carozza

As to Plaintiffs' characterization of Carozza as an owner (operator or transporter), Carozza argues that Plaintiffs' Amended Complaint provides only conclusory allegations that recite the elements of a CERCLA claim, without explanation as to Carozza's alleged involvement in activities that could give rise to liability.  (Carozza Mem., at 12.)[23]  In essence, as relevant to this section, Carozza challenges whether Plaintiffs have provided sufficient factual content to allege that he may qualify as an owner under CERCLA.

Plaintiffs assert Carozza is liable under CERCLA Section 107(a)(2), (*see* Pl. Opp. at 8-9), which covers prior owners and operators. *N.Y. v. Next Millennium Realty, LLC*, 160 F. Supp. 3d 485, 505 (E.D.N.Y. 2016) (citing *State of New York v. Shore Realty Corp*., 759 F.2d 1032, 1044 (2d Cir.1985)).  Under this section, a prior owner can be held liable if, during the time they owned the facility in question, hazardous substances were disposed of on that property.  42 U.S.C. 9607(a)(2).  Disposal is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste so that such … waste … may enter the environment…"  42 U.S.C. § 6903; *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 358 (2d Cir. 1997) (noting the definition of disposal in the context of 42 USC 9607(a)).

To allege this claim, Plaintiffs assert the following: Carozza and his partner owned the Property from 1993 until 2012; during that time, "Carozza oversaw the disposal, release and removal of radioactive soil and substances" from the Property, and the "regular disturbance, release and disposal of radioactive soil further contaminated and damaged" the Property.  (*See*

---

[23] Carozza sets forth this general contention as to all CERCLA claims, and does not offer specific arguments with regard to Plaintiffs' allegations against him as to owner, operator or transporter liability.  (Carozza Mem. at 11-12.)

FAC at ¶ 31, 119, 120.)  Thus, Plaintiffs plausibly allege that Carozza owned 105 Mt. Kisco during the time hazardous substances were "leak[ed], spill[ed]," or disposed of on the Property.

### 2.   Village of Mount Kisco

Defendant Village argues that Plaintiffs' claim of owner liability against it arise out of Plaintiffs' claims against MKURA, and are asserted against the Village only as successor to MKURA's liabilities.  Plaintiffs merely respond that it has plausibly alleged that the Village is liable as an "owner" because the Amended Complaint "states that MKURA owned the Property during the negligent remediation and that the Village owned it thereafter."  (*See* Pls'. Opp to Village at 7.)

Though Plaintiffs' owner liability claim against the Village arises from the allegation that all Defendants, including the Village, "owned or operated" the Mt. Kisco Property when the Refinery was demolished and Railroad Avenue was relocated (FAC ¶¶ 214-220), the complaint specifically alleges that MKURA, rather than the Village, owned the property during the relevant time period.  (*See* FAC at ¶¶ 93-96, 100.)  Plaintiffs do not allege that the Village is a current owner (§ 9607(a)(1)), or that it is a prior owner that owned the Property at the time that hazardous substances were disposed of at the facility, (*see* § 9706(a)(2)).  Because Plaintiffs' owner liability claim against the Village appears to arise out of Plaintiffs' previously dismissed successor liability claim, and Plaintiffs fail to plausibly allege owner liability against the Village, this claim is dismissed.

### b)  Operator Liability Claims

Pursuant to 42 U.S.C. § 9607(a)(1), an "operator" of a facility may also be held liable under CERCLA.  Under CERCLA, a person is liable as a past "operator" if he "at the time of disposal of any hazardous substance … operated any facility at which such hazardous substances were

disposed of." 42 U.S.C. § 9607(a)(2).  More specifically, for a party to be held liable as an "operator," it must have "manage[d], direct[d], or conduct[d] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *N.Y. State Elec. & Gas Corp.*, 766 F.3d at 222.  This has been understood to imply a "level of control *over the hazardous substances at issue*." *Yankee Gas Servs. Co. v. UGI Utilities*, 428 F. App'x 18, 19–20 (2d Cir. 2011) (summary order) (internal citations omitted); s*ee Next Millennium Realty, L.L.C. v. Adchem Corp.*, 03-CV-5985 (ARL), 2015 WL 11090419, at *13 (E.D.N.Y. Mar. 31, 2015) (citing *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 328 (2d Cir. 2000)). ("It is settled in this circuit that owner and operator liability should be treated separately.")

### 1.  Carozza

Carozza argues that Plaintiffs have failed to proffer sufficient factual allegations to plausibly allege that Carozza is an "operator" under CERCLA.  (*See* Carozza Mem., at 11-13.)  In the Amended Complaint, Plaintiffs allege that Carozza operated the Richard Lumber's facility on the Property beginning in 1980, until 2012, that he oversaw the disposal, release and removal of radioactive soil and substance from the Property, and that this "disturbance" of radioactive soil contaminated and damaged the Property. (FAC ¶¶ 117, 118, 120, 121.)  Although duplicative of the allegations asserted to establish Plaintiffs' ownership liability claim against Carozza, the Court finds, at this stage, that Plaintiffs have provided sufficient detail to plausibly allege their operator liability claim.

### 2.  Village of Mount Kisco

Plaintiffs allege that the Village "directed the construction of Railroad Avenue, which further released and dispersed radioactive materials throughout 105 Kisco Avenue" and that the

"grossly negligent demolition of the Refinery, construction of Railroad Avenue and disposal of waste from the Mt. Kisco Property" caused by the Village and other defendants led to "the release and distribution of radioactive materials at 105 Kisco Avenue."  (FAC ¶¶ 99, 101.)  Drawing all reasonable inferences in favor of Plaintiffs, to the extent this claim is alleged against the Village based upon the Village's own actions separate from MKURA, the Court finds that Plaintiffs have plausibly alleged that the Village managed or conducted operations related to the disposal of hazardous waste such that it may be liable as an "operator" under CERCLA.

### c)  Arranger Liability

Under 42 U.S.C. § 9607(a)(3), "arranger" liability is imposed upon:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances

42 U.S.C. § 9607.  "Under the plain terms of the statute, [defendants] may be liable under § [107(a)(3)] if they: (1) arranged for the disposal of, (2) hazardous substances, (3) owned or possessed by them."  *N.Y. v. Town of Clarkstown*, 95 F. Supp. 3d 660, 678 (S.D.N.Y. 2015).  "Arranger liability can attach 'to parties that do not have active involvement regarding the timing, manner or location of disposal,'" but "there must be some nexus between the potentially responsible party and the disposal of the hazardous substance." *Gen. Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir. 1992).  Where the party is not actively involved in the disposal of waste, "it is the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger under CERCLA's liability provision." *Id.*

1. Carozza

Regarding Carozza's role as an "arranger," Plaintiffs allege that Carozza arranged for the removal of contaminated soil from the Property, which further dispersed and released radioactive materials throughout the property.  (FAC ¶ 121.)  Though a lean allegation, considered within the context of the other allegations against Carozza, the Court finds that Plaintiffs have plausibly alleged a claim for arranger liability.

2. Village of Mount Kisco

As to the Village, Plaintiffs alleges that the Village and others were involved in the disposal of waste, that Teledyne and/or Westwood contracted with the Village and others to dispose of the contaminated material from the former Canrad site, and that the contaminated material was subsequently released and spread throughout the Property.  (*See* FAC ¶¶ 99, 103, 232.) This is sufficient for the Court to infer that the Village may have had a contractual obligation to exercise control over hazardous waste disposal.  On this basis, the Court finds that Plaintiff has plausibly alleged a claim for arranger liability against the Village.

3. WCDOH

At the very least, drawing all inferences in Plaintiffs' favor, the Amended Complaint alleges that WCDOH participated in the negligent demolition and decontamination of the Refinery (FAC ¶ 8), and in that effort effectively arranged for disposal or treatment of hazardous substances at the Property, releasing radioactive materials into previously clean areas, including but not limited to uranium and its constituents and byproducts (FAC ¶¶ 51, 96-99, 103, 232.)  WCDOH argues that these allegations are conclusory, and that the exhibits to the Amended Complaint "could not be reasonably found to establish that the WCDOH owned or possessed the hazardous materials."  (*See* WCDOH Mem. at 19.)  Throughout its papers, WCDOH has made the argument

that the documents provided by Plaintiffs do not "prove" the allegations asserted, relying on an absence of material to support its claim.  The Court reminds the parties that at this stage, Plaintiffs need only plausibly allege their claims.

It is perhaps a basic tenant that plaintiffs need not, and often at this stage, prior to completion of discovery, cannot provide documentary evidence to support every allegation made in the complaint, and are not expected to do so.  *See generally Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Although WCDOH could prevail by pointing to exhibits to the Amended Complaint that refute Plaintiffs' allegations, it does not do so here.  The documents cited by WCDOH do not refute, as alleged by Plaintiff, the possibility that WCDOH could have been involved in arranging for the disposal of hazardous waste at some point during the course of response efforts.  Thus, drawing all reasonable inferences in favor of Plaintiff, as one must at this stage, the Court finds that Plaintiffs have provided sufficient factual content to state a claim for arranger liability against WCDOH.[24]

### d)  Transporter Liability Claims

Under 42 USC § 9607(a)(4), "transporter" liability is imposed:

> any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

"To [allege] a prima facie case of CERCLA transporter liability, "a plaintiff must first have made a showing that a defendant transporter actually brought hazardous substances to the site, whether knowingly or not."  *United States v. Lyon*, CVF-070491 (LJO) (GSA), 2008 WL 756294, at *3 (E.D. Cal. Mar. 17, 2008) (citing *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 604 (2 Cir. 1999)).

---

[24] Given the Court's ruling, WCDOH's and Carozza's arguments that the Court should decline to exercise pendant jurisdiction over Plaintiffs' state claims, which is premised upon the assumption federal claims against these Defendants would be dismissed, is deemed moot.

Additionally, "a person is liable as a transporter … if it ultimately selects the disposal facility … [or if] it actively participates in the disposal decision to the extent of having had substantial input into which facility was ultimately chosen." *Id.* (citing *Tippins Inc. v. USX Corp.*, 37 F.3d 87, 94 (3rd Cir.1994.  Thus, to establish liability as a transporter a plaintiff must "allege[] that the party accepted hazardous substances for transport, and either selected the disposal facility or had substantial input into deciding where hazardous substance should be disposed." *Id.* (citing *United States v. USX Corp.*, 68 F.3d 811, 820 (3d Cir. 1995).

### 1.  WCDOH

Plaintiffs' Amended Complaint alleges only that WCDOH is "a person who transported or who selected disposal or treatment sites' for the disposal of hazardous substances, including, but not limited to uranium and its constituents and byproducts from the Mt. Kisco Property." (*See* FAC ¶ 241.)  Plaintiffs proffer no factual assertions in support of the allegation that WCDOH was involved in the transport of hazardous waste to the Property, and its allegations largely mirror the language of CERCLA.  Because the Amended Complaint presents only a conclusory allegation as to WCDOH's transporter liability, and Plaintiffs' opposition provides little explanation to elucidate the basis for this allegation, the Court dismisses Plaintiffs' transporter liability claims against WCDOH.

### 2.  Village of Mount Kisco

The Village contends that Plaintiffs' transporter liability amounts to little more than a formulaic recitation of CERCLA language.  (Village/MKURA Mem. at 16.)  The Court does not disagree.  Because Plaintiffs allege in a conclusory fashion that the Village can be found liable as a transporter, without additional allegations as to its involvement in the transportation of hazardous waste to the Property as an individual entity separate from MKURA (*see* FAC ¶ 103, 241; Pl. Opp.

Re Village/MKURA at 9 (citing FAC ¶ 95-99)), Plaintiffs' transporter claim against the Village is dismissed.

### 3. Defendant Carozza

As to Carozza, Plaintiffs essentially argue that the allegations for their arranger liability claim are sufficient to state a claim for transporter liability.  (*See* Pl. Opp. Re Carozza at 11) ("the amended complaint alleges that Carozza oversaw and arranged for the disposal, release and removal of radioactive substances from the Property, causing … radioactive waste to spread .... [and] that the Property remains contaminated …. These allegations are sufficient to state a claim for transporter liability.").)  Though under certain circumstances, overlapping factual allegations could form the basis for allegations as to both categories of "potentially responsible parties," in this instance the Amended Complaint fails to plausibly allege that Carozza acted as a transporter as described in 42 U.S.C. § 9607(a)(4).

To accept Plaintiffs' contention that, if a party is an alleged "arranger" under CERCLA, they must also be a "transporter," would obliterate the difference between the two categories, however related they may be.  Notably, Plaintiffs do not cite any case law to support this contention.  The Court is unwilling to accept Plaintiffs' inference that every arranger must also have engaged in the conduct of a "transporter" absent additional allegations indicating the party may be liable as such.  For these reasons, the Court dismisses Plaintiffs' claim for transporter liability against Carozza.

## VII. **Response Costs Under CERCLA**

As stated previously, to present a prima facie case for the recovery of response costs incurred from cleaning up a waste site, a private plaintiff must show: "1) that a defendant falls under one of the four categories of covered persons, 2) that the site is a 'facility' as defined by

CERCLA, 3) that there has been a release or threat of release of a hazardous substance at the facility, 4) *that the release or threat of release caused the plaintiff to incur response costs, and 5) that plaintiff's costs were "necessary costs of response ... consistent with the National Contingency Plan [("NCP")]*." *Warwick Admin. Grp. v. Avon Prod., Inc.*, 820 F. Supp. 116, 121 (S.D.N.Y. 1993) (citing 42 U.S.C. § 9607(a)). "The National Contingency Plan is essentially the federal government's toxic waste playbook, detailing the steps the government must take to identify, evaluate, and respond to hazardous substances in the environment … Adherence to the [NCP] is the gatekeeper to seeking reimbursement of response costs." *Next Millennium Realty, LLC*, 160 F. Supp. 3d at 510 (internal citations omitted).

Defendants WCDOH, Carozza and the Village/MKURA essentially argue that Plaintiffs fail to allege the fourth and fifth prong of a prima facie case for recovery. Defendants contend that Plaintiffs fail to state a plausible claim for response costs under CERCLA because Plaintiffs' expenses were incurred solely in preparation for litigation, and not in conjunction with any removal or remediation efforts consistent with the NCP, that Plaintiffs fail to allege that any threat to human health or the environment existed prior to the actions allegedly taken by Plaintiffs and instead, that the costs asserted are a result of a failure to conduct prior due diligence before taking an ownership interest in the Premises. (*See* WCDOH Mem. at 22-23; Carozza Mem. at 12, Village/MKURA Mem. at 18.) In response, Plaintiffs merely contends that allegations of current and future costs are sufficient to state a plausible claim for relief, and that its allegation that it has expended tens of thousands of dollars "researching and investigating" the extent of contamination, and expects to spend tens of thousands more can thus sustain its claim. (*See, e.g.*, Pls'. Opp Re WCDOH at 18-19.)

At this stage, Plaintiffs must allege that it "incurred costs responding to the release or the

threat [of release] and … [that] the costs and response conform to the National Contingency Plan." *Price Trucking Corp. v. Norampac Indus., Inc.*, 748 F.3d 75, 80 (2d Cir. 2014). However, Plaintiffs "need not particularize the costs incurred," and "an allegation that plaintiff has incurred and will continue to incur expenses and costs ... sufficiently allege[s] recoverable response costs". *Alloy Briquetting Corp. v. Niagara Vest, Inc.*, 756 F. Supp. 713, 717 (W.D.N.Y. 1991). District courts in this Circuit have found that expenses incurred during initial evaluations and investigations are recoverable under CERCLA as response costs. *MPM Silicones, LLC*, 2016 WL 3962630, at *24. Furthermore, courts in this Circuit have found that "because initial monitoring, assessment, and evaluation expenses are recoverable … the costs of … studies are all found to be necessary costs consistent with the national contingency plan, as CERCLA requires". *Id.* (internal quotation marks and citations omitted).

Plaintiffs allege that they have undertaken, and will continue to undertake, investigations and actions in response to the release or threatened releases of hazardous substances, that those actions include the "environmental sampling and analysis, and coordinating with EPA and state environmental authorities," and that they have expended tens of thousands of dollars as a result. (FAC ¶¶ 132, 240, 246.) As such, Plaintiffs have plausibly alleged recoverable responses costs under CERCLA. *Alloy Briquetting Corp.*, 756 F. Supp. at 717 (noting courts have found allegation that plaintiff "has incurred and will continue to incur expenses and costs ..." sufficient to allege recoverable response costs, and finding plaintiff alleged response costs with sufficient specificity where it asserted it "incurred … costs for testing, investigation, and remediation of the releases into the soil, subsoil, surface water, and ground water"); *see also Commerce Holding Co. v. Buckstone*, 749 F. Supp. 441, 444 (E.D.N.Y. 1990) ("While a private party, to recover its response costs, bears the burden of pleading and proving that the costs incurred are consistent with the NCP,

the question of consistency with the NCP cannot be determined on the complaint alone but requires the development of a factual record").

### d) Plaintiffs' Claims for Contribution & Indemnification

Defendant Carozza, Merritt, and the Village assert that Plaintiffs' claims for contribution and indemnification are either preempted by CERCLA or not ripe.  (*See, e.g*., Village/MKURA Mem. at 23-25.)  Again, Plaintiffs choose not to address challenges to its indemnification and contribution claims in response *to any of* the three sets of motion papers set forth by these Defendants.  Plaintiffs' choice not to oppose Defendants' arguments are deemed purposeful, and these claims are considered abandoned. *See Tuman,* 2017 WL 781486, at *7–8 (citing *Westchester Cty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 618 (S.D.N.Y. 2015) ("abandonment constitutes an[ ] independent ground for dismissal").

### CONCLUSION

For the foregoing reasons, Defendant WCDOH's motion to dismiss is GRANTED in part and DENIED in part, Defendants Village of Mount Kisco/MKURA's motion to dismiss is GRANTED in part and DENIED in part, Defendant Carozza's motion to dismiss is GRANTED in part and DENIED in part, Defendant Merritt's motion to dismiss or for summary judgement and for sanctions is GRANTED in part and DENIED in part, and Defendant Teledyne/Environmental Inc.'s motion to dismiss is GRANTED in its entirety.   Defendants Merritt, Teledyne/Environmental Inc., and MKURA are dismissed from this action.  Plaintiffs' claims for indemnification and contribution are dismissed as against all parties, and Plaintiffs' claims for "remediation" actions as defined by CERCLA are dismissed with prejudice.  Plaintiffs' claim against Carozza subject to arbitration is dismissed as described herein.  As to claims not dismissed with prejudice, Plaintiffs are granted leave to file an amended complaint in conformance with this

Opinion on or before April 29, 2017. The Defendants are directed to file responsive pleadings by May 29, 2017. The parties are directed to contact the chambers of Magistrate Judge McCarthy to schedule a status conference. The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 107, 115, 121, 128, and 136.


Dated:   March 3o, 2017                          SO ORDERED:
         White Plains, New York

                                                 _____
                                                 NELSON S. ROMÁN
                                                 United States District Judge

47