USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/20/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

105 MT. KISCO ASSOCIATES LLC,
AMANDA'S LANE LLC, and MARK STAGG,

                  Plaintiffs,

     -against-

PAUL CAROZZA, RICHARD'S HOME CENTER
& LUMBER, INC., RICHARD'S LUMBER &
BUILDING MATERIALS CENTER, INC.,
CANRAD as successor to CANADIAN RADIUM
& URANIUM CORP., VILLAGE OF MOUNT
KISCO, WESTCHESTER COUNTY
DEPARTMENT OF HEALTH, UNITED STATES,
WESTWOOD NUCLEAR CORP. as successor to
ISOTOPES INC., NDL ORGANIZATION, INC.,
as successor to NUCLEAR DIAGNOSTICS
LABORATORIES, INC., MERRITT
ENVIRONMENTAL CONSULTING CORP.,

                  Defendants.

No. 15 Civ. 5346 (NSR)
Opinion & Order

---

NELSON S. ROMÁN, United States District Judge

Plaintiffs 105 Mt. Kisco Associates LLC ("105 Mt. Kisco Associates"), Amanda's Lane

LLC ("Amanda's Lane") and Mark Stagg ("Stagg") (collectively, "Plaintiffs") bring this action

pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA"), 42 U.S.C. § 9601 *et. seq.*, against Defendants Paul Carozza ("Carozza"); Richards

Home Center & Lumber, Inc. and Richard's Lumber & Building Materials Center, Inc. ("Richards

Lumber"); Village of Mount Kisco ("Mt. Kisco"); Westchester County Department of Health

("WCDH"); the United States; Canrad, as successor to Canadian Radium & Uranium Corp.

("Canrad"); Westwood Nuclear Corp., as successor to Isotopes, Inc. ("Westwood"); the NDL

Organization, as successor to Nuclear Diagnostics Laboratory, Inc. ("NDL"); and Merritt

Environmental Consulting Corp. ("Merritt") (collectively, "Defendants"), in connection with the contamination of real property located at 105 Kisco Avenue, Mt. Kisco, New York ("the Property" or "105 Mt. Kisco"), as well as the purchase, maintenance, and refinancing of said Property.

Before this Court are motions to dismiss filed by Defendants Mt. Kisco, WCDH, Carozza, and Merritt, and a motion for sanctions filed by Merritt. For the following reasons, Defendants WCDH, Mt. Kisco, and Carozza's motions to dismiss are DENIED, Defendant Merritt's motion to dismiss is GRANTED, and Defendant Merritt's motion for sanctions is DENIED.

## BACKGROUND

### I. Factual Background

The Court assumes familiarity with the facts in this matter but again summarizes them below to accurately reflect the allegations in the Second Amended Complaint ("SAC"). For purposes of Defendants' motions, the Court accepts the allegations in the SAC as true. The Court again only includes those facts relevant to the motions.

### A. The Initial Contamination of the Property

105 Mt. Kisco has a long history of radiological contamination stemming from the Property's involvement in the Manhattan Project during World War II. (SAC ¶ 5, ECF No. 184.) The contamination began in 1942, when Canrad started operating a refinery located at the Property's present-day location (the "Refinery"). (*Id.* ¶ 65.) Eventually, the United States began using the Refinery to "harness the capabilities of uranium for war," culminating in the production of the first atomic bomb. (*Id.* ¶¶ 68-69.) Specifically, the United States purchased uranium from various countries, and contracted with Canrad to process the uranium residues at the Refinery. (*Id.* ¶¶ 70-72.) Pursuant to that contract, Canrad extracted radium, polonium, radium-D, and actinium and then supplied those materials to the United States. (*Id.* ¶¶ 72-73.) The waste from the

production processes led to radiological contamination "in each of the processing areas, the ancillary and storage areas, and throughout the Refinery." (*Id.* ¶ 78.)

After World War II concluded, Canrad shifted production from processing uranium for the Manhattan Project to producing commercial quality radium and uranium for instruments, watch dials, and medical applicators. (*Id.* ¶ 80.) Around the same time, Canrad came under increased government scrutiny, which culminated with multiple government inspections in the 1940s and 1950s. (*Id.* ¶ 81.) Those inspections revealed "deplorable conditions at the Refinery," including "high radiation exposure rates." (*Id.*) As a result of this contamination, the New York State Department of Health ("DOH") directed Canrad to dispose of radioactive waste originating from the Property. (*Id.* ¶ 84.) Accordingly, between 1958 to 1966, Canrad conducted multiple recovery operations, although those failed to decontaminate the Property. (*Id.* ¶ 85.)

## B. Demolition of the Refinery and the Subsequent Spread of Contamination

In 1966, the Mount Kisco Urban Renewal Agency ("MKURA") purchased the Property and intended to rehabilitate and return it to market. (*Id.* ¶ 87) In coordination with WCDH, MKURA worked with contractors in November 1966 to expedite the demolition of the Refinery and decontamination of the Property. (*Id.* ¶ 89.) However, in doing so, MKURA and WCDH released radioactive materials and contaminated previously clean areas. (*Id.* ¶ 90.)

In addition to WCDH and MKURA, several other entities were purportedly responsible for the release and distribution of radioactive materials. (*Id.* ¶ 92.) For example, Mt. Kisco allegedly arranged for and directed the construction of Railroad Avenue, which further released and dispersed radioactive materials throughout the Property. (*Id.* ¶ 93.) Similarly, Westwood contracted with "MKURA, WCDH and/or the Village of Mt. Kisco" to dispose of contaminated material, but it failed to "dispose of large amounts of contaminated soil [that were] released and spread throughout 105 Kisco Avenue." (*Id.* ¶ 94.) Finally, although working with Westwood to

"dispose the most highly contaminated materials," NDL also furthered contamination throughout the Property.  (*Id.* ¶¶ 95-96.)

### C.  Carozza's Awareness and Spreading of Contamination

From 1980 to 2012, Carozza owned and operated Richard's Lumber on the Property.[1] (*Id.* ¶¶ 108-09.)  In that capacity, Carozza was seemingly aware of the possibility that the Property was contaminated.  He submitted an affidavit in connection with the lawsuit against Mt. Kisco that affirmed that he had learned about radiation hot spots on the Property in 1993.  (*Id.* ¶¶ 113-14.) Carozza also allegedly arranged for the removal of contaminated soil, which further dispersed and released radioactive materials through the Property.  (*Id.* ¶ 112)

### D.  Further Government Investigations

Beginning in the late 1970's, local, state, and federal agencies discovered and reported on harmful contaminates at the Property.  (*Id.* ¶ 99.)  First, in February 1980, WCDH surveyed the Property and "confirmed new areas of contamination" that had not been previously identified.  (*Id.* ¶ 100.)  Later, in September 1993, DOH's Bureau of Environmental Radiation Protection, in coordination with WCDH, completed a new survey of the Property and identified multiple hot spots of radioactivity throughout.  (*Id.* ¶ 101.) Then, in 1994, the United States Environmental Protection Agency ("EPA") conducted an on-site inspection to measure radon levels, gauge exposure rates, and collect air and soil samples.  (*Id.* ¶ 102.)  Although it did not select the Property as a candidate for the National Priorities List, EPA did observe "elevated" radioactivity exposure rates on the Property's northern and southern portions.  (*Id.*)  Finally, in July 1998, the New York

---

[1]     Plaintiffs state in the complaint that, upon their information and belief, Carozza operated Richard's Lumber beginning in 1980, but they also allege that "Defendant Carozza owned and operated defendant Richard's Lumber . . . from 1993 until 2012." (*Id.* ¶¶ 108-09.)  As Plaintiffs subsequently point to Carozza's "thirty-two years of operation and ownership" of Richard's Lumber (*id.* ¶ 110), the Court will presume for purposes of this motion that Richard's Lumber was operated on the Property from 1980 to 2012.

State Department of Environmental Conservation ("DEC") conducted its own radiological survey of the Property for Mt. Kisco and Richard's Lumber. (*Id.* ¶ 103.) DEC identified the presence of radiological material under the parking lot of 105 Mt. Kisco. (*Id.* ¶ 104.) DEC also indicated that a large part of the Property's main outside storage area was contaminated with radium. (*Id.* ¶ 105.)

In 2013, the EPA again decided to investigate 105 Mt. Kisco. (*Id.* ¶¶ 107, 121.) Specifically, in September 2013, EPA investigators commenced an on-site reconnaissance and gamma radiation screening of the Property. (*Id.* ¶ 122.) The investigation found radium contamination and noted that the Property's condition had not changed significantly since DEC issued its 1998 report. (*Id.* ¶ 123.) Almost two years later, on June 22, 2015, EPA, DEC, and DOH met with Plaintiffs to discuss remediation of the Property, and EPA informed Plaintiffs that it would issue an order directing remediation. (*Id.* ¶ 124.) Plaintiffs have, to date, expended "tens of thousands of dollars researching and investigating the extent of the radiological contamination and expect to spend tens of thousands more to fully comprehend it and remedy it." (*Id.*)

### E. Carozza's Alleged Fraudulent Scheme

#### a. Carozza's Conduct

In late Summer 2012, Richard's Lumber was in dire straits. (*Id.* ¶ 125.) It had defaulted on its mortgage for 105 Mt. Kisco, and the local Teamsters Union had outstanding judgments against it for more than $200,000. (*Id.*) Given these issues, Carozza "schemed to draw Stagg into a partnership, offload the Mt. Kisco Property, and satisfy the Mortgage and Teamster's Judgment." (*Id.* ¶ 127.)

Recognizing that Stagg would never purchase contaminated property, Carozza failed to disclose any radiological contamination at 105 Mt. Kisco while the parties discussed their budding partnership. (*Id.* ¶¶ 128-29.) Without knowledge of the radioactive contamination, Stagg

eventually agreed to form two LLCs, NY Stone and 105 Mt. Kisco Associates, to start a masonry supply business.  (*Id.* ¶ 132.)  Stagg, through Amanda's Lane, then agreed to purchase the Property and assume the mortgage.[2]  (*Id.* ¶ 133.)

Carozza never disclosed the radioactive contamination to Stagg, leaving him wholly uninformed about the hazardous radium and uranium waste beneath the surface of the Property.  (*Id.* ¶ 137.)  In fact, as Plaintiffs contend, Carozza went to great lengths to avoid divulging information regarding radioactivity.  For example, upon learning of the EPA's 2013 investigation, Carozza used his position as store manager of NY Stone to conceal it.  (*Id.* ¶ 157.)  Carozza purportedly represented himself to the EPA as the "current property owner" and prevented investigators from performing gamma-level screenings within, or otherwise entering, the NY Stone building.  (*Id.* ¶¶ 159-60.)  Carozza then concealed his knowledge of EPA's work from Stagg.  (*Id.* ¶ 161.)

#### b.  *Plaintiffs' Financial Investments and Conduct in Reliance*

Eventually, on December 21, 2012, Amanda's Lane purchased 105 Mt. Kisco.  (*Id.* ¶ 142.)  Upon this purchase, Stagg assumed all responsibility for Richard's Lumber's mortgage loan from Community Bank and guaranteed the Assumption of Mortgage without any guaranty from Carozza or Richard's Lumber.  (*Id.* ¶ 143.)  Stagg, through Amanda's Lane, also paid $488,326.40 to Richard's Lumber to satisfy the Teamster's judgment, with $333,198.75 going directly to Carozza.[3]  (*Id.* ¶ 145.)  Later in 2013, at Carozza's insistence, Stagg personally loaned nearly $3 million ($2,960,000) to NY Stone to pay for pre- and post-opening improvements and modifications, which are contributions Stagg never would have made had he been aware of

---

[2]      Amanda's Lane's purchase of the Property purportedly relieved Carozza and Richard's Lumber of radiation-related liabilities.  (*Id.* ¶ 134.)

[3]      Carozza and Richard's Lumber finalized their settlement with the Teamsters on March 13, 2013.  (*Id.*)

radioactive contamination at 105 Mt. Kisco.  (*Id.* ¶¶ 150-51.)  Finally, in March 2014, Stagg and Carozza executed an Operating Agreement to govern 105 Mt. Kisco Associates.  (*Id.* ¶ 153.) Again, Stagg would never have entered into the agreement or the 105 Mt. Kiso Associates relationship if he was aware of the radioactive contamination.  (*Id.* ¶ 155.)

### F.  Merritt's Phase I Report

In Spring 2014, Stagg and Carozza decided to refinance the mortgage to pay back the $2,960,00 Stagg had loaned to NY Stone.  (*Id.* ¶ 164.)  The parties agreed to use BankUnited to refinance the mortgage, and, in turn, sought a Phase I Environmental Site Assessment.  (*Id.* ¶ 165.) BankUnited then contracted with Merritt to conduct a comprehensive assessment (the "Phase I Report").  (*Id.* ¶ 166.)

Merritt's assessment was intended to uncover the presence or likely presence of hazardous substances.  (*Id.* ¶ 180.)  Merritt, however, purportedly did not conduct the assessment in accordance with applicable standards.  (*Id.* ¶ 181.)  For example, it failed to interview relevant parties or further investigate the hazardous waste history of surrounding properties.  (*Id.* ¶¶ 182-84, 189-97.)  As Plaintiffs aver, Carozza also provided false and misleading answers to Merritt in the "Owner's Questionnaire," indicating that he was not aware of the past existence of hazardous substances.  (*Id.* ¶ 185.)  Yet, had Merritt conducted a proper investigation, it would have noted significant radium and uranium contamination on the Property and its history of governmental investigations.  (*Id.* ¶¶ 185-86.)

Merritt allegedly knew the costs of the Phase I Report would be borne by 105 Mt. Kisco Associates at closing because the only reason (though not specified in the Phase I Report) BankUnited contracted with Merritt to perform assessment was because 105 Mt. Kisco Associates wanted to refinance the mortgage.  (*Id.* ¶¶ 174-75.)  Plaintiffs also point to how Merritt's owner,

Charles Merritt, recognized that environmental assessments, in general, are relied upon by others and are "a tool used by lenders like an appraisal or a title insurance to provide information for client [sic] to make a better business decision." (*Id.* ¶ 171.) Thus, Plaintiffs maintain that Merritt was supposedly aware that, in addition to BankUnited, Plaintiffs would use and rely on the Phase I Report for the mortgage refinancing. (*Id.* ¶ 177.)

## II.    Procedural Background

### A. Defendants' Initial Motion to Dismiss

Plaintiffs commenced this action on July 9, 2015. (ECF No. 1.) On February 3, 2016, Plaintiffs then filed their First Amended Complaint ("FAC"). (ECF No. 86.) The FAC asserted thirteen claims, namely (1) operator liability under CERCLA § 107(a); (2) arranger liability under CERCLA § 107(a); (3) transporter liability under CERCLA § 107(a); (4) money judgment for past response costs; (5) fraudulent inducement, unjust enrichment, money had and received, and equitable estoppel solely against Carozza and Richard's Lumber; (6) negligence/negligent misrepresentation/malpractice and breach of contract solely against Merritt; and (7) contribution and indemnification against all defendants. Thereafter, Defendants moved to dismiss the FAC. (ECF Nos. 107, 115, 121, 136.)[4]

#### a. WCDH

In its motion to dismiss, WCDH first argued that it was an improper defendant, and that Plaintiffs should have sued Westchester County instead. (ECF No. 109 at 8-9.) WCDH then contended that Plaintiffs' claims were time-barred under CERCLA's applicable statute of limitations. (*Id.* at 10.) WCDH separately maintained that it was entitled to Eleventh Amendment

---

[4]    Teledyne, a former defendant in this case, also moved to dismiss. (ECF No. 128.) The Court ultimately granted Teledyne's motion, and it dismissed it from the case. (ECF No. 174 at 26-28.)

immunity, or, alternatively, state and local government immunity. (*Id.* at 14-15.) Finally, WCDH argued that Plaintiffs failed to state a claim for arranger or transporter liability.[5] (*Id.* at 17, 21.)

### b. *Mt. Kisco/MKURA*[6]

Mt. Kisco and MKURA advanced similar bases for dismissal. *First*, MKURA argued that all claims against it must be dismissed because it lacked the capacity to be sued. (ECF No. 116 at 7.) *Second*, to the extent Plaintiffs advanced claims against Mt. Kisco regarding MKURA's liabilities, Mt. Kisco had not succeeded or assumed MKURA's liabilities. (*Id.* at 10.) *Third*, Mt. Kisco contended that Plaintiffs failed to state CERCLA claims for operator liability, arranger liability, transporter liability, and money judgment for past response costs. (*Id.* at 13-17.) *Finally*, Mt. Kisco maintained that Plaintiffs failed to sufficiently allege response costs or costs consistent with the national contingency plan. (*Id.* at 18, 21.)

### c. *Carozza*

Similar to Mt. Kisco and WCDH, Carozza first attacked Plaintiffs' CERCLA claims. Carozza maintained that Plaintiffs failed to state claims upon which relief could be granted under CERCLA and that Stagg and Amanda's Lane lacked standing under CERCLA. (ECF No. 122 at 11-15.) Carozza also argued that Plaintiffs' claim for equitable estoppel should be dismissed. (*Id.* at 15.) Finally, Carozza argued that any CERCLA claim must be arbitrated pursuant to the Operating Agreement between Carozza and Stagg. (*Id.* at 16.)

Carozza then turned to Plaintiffs' state law claims. Carozza argued that Plaintiffs' state law claims were governed by a binding arbitration agreement between Carozza and Stagg. (*Id.* at 17.) Carozza then contended that Amanda's Lane should also be subject to arbitration. (*Id.* at 19.)

---

[5]     WCDH also argued that, to the extent applicable to WCDH, Plaintiffs' state law claims should likewise be dismissed. (ECF No. 109 at 23-24.)

[6]     Mt. Kisco's motion was brought together with MKURA, a former defendant.

### d. Merritt

Merritt focused on Plaintiffs' state law claims for negligent misrepresentation and breach of contract. (ECF No. 139 at 10.) It first argued that Plaintiffs failed to state a claim for negligent misrepresentation, pointing to the absence of "linking conduct." (*Id.* at 13.) Merritt then explained that Plaintiffs' claim for breach of contract failed because Plaintiffs did not establish that they were intended third-party beneficiaries. (*Id.* at 19.) Merritt also moved for the imposition of sanctions against Plaintiffs. (*Id.* at 23.)

### B. The Court's March 30, 2017 Opinion

On March 30, 2017, the Court (1) granted in part and denied in part WCDH's motion, (2) granted in part and denied in part Mt. Kisco/MKURA's motion, (3) granted in part and denied in part Carozza's motion, and (4) granted Merritt's motion to dismiss while denying its motion for sanctions. *105 Mt. Kisco Assocs. LLC v. Carozza*, No. 15 Civ. 5346 (NSR), 2017 WL 1194700, at *1 (S.D.N.Y. Mar. 30, 2017) (ECF No. 174) (the "*2017 Opinion*").

The Court first addressed the arguments relevant to individual movants only. *Id.* at *4. As to Merritt, the Court concluded that Plaintiffs failed to "provide factual allegations upon which the Court could conclude that there may have been a privity-like relationship between the parties." *Id.* at *5. In so holding, the Court determined that Plaintiffs failed to establish any "linking connection between Plaintiffs and Merritt," such as "face-to-face conversation, the sharing of documents, or other 'substantive communication' between the parties." *Id.* (quoting *Sec. Inv'r Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 75 (2d Cir. 2000)). The Court explained that it was not enough to allege that the "reliant party or class of parties was actually known or foreseen by the defendants." *Id.* The Court observed that the "Phase I Report specifically state[d] that the report

ha[d] been prepared for the sole use of Merritt's client, the Bank, and that 'no other party may use the report without the written authority' of Merritt."[7] *Id.* at *6.

The Court next turned to WCDH's motion to dismiss. The Court first declined to dismiss WCDH as an improper party, explaining that although "[i]t may ultimately be most appropriate to substitute [Westchester] County for WCDOH in this action," "Plaintiffs' claims [were] appropriately alleged against WCDOH at this time." *Id.* at *7. The Court likewise rejected WCDH's claims of immunity, noting that CERCLA "expressly includes municipalities, states, and other political subdivisions within its definition of persons who can incur such liability under § 9670," and that Plaintiffs "plausibly allege[d] that WCDOH engaged in the kind of activity that would incur liability under CERCLA."[8] *Id.* at *9-10. Finally, as is relevant to the instant motion, the Court addressed the "[t]imeliness of Plaintiffs' [c]laims." *Id.* at *7. The Court initially noted parties' apparent "acknowledgment that remediation and removal efforts . . . took place prior to Plaintiffs' involvement with the Property." *Id.* at *8. Then, without making a definitive characterization of the decontamination efforts at the Property in the 1960s, the Court opined that, to the extent the work was remedial, such claims would be barred under the statute of limitations.[9] *Id.* at *9. The Court, however, was clear that Plaintiffs had not indicated whether it had, or planned to, engage in remedial or removal work, and that it could not "discern the nature of Plaintiffs' conduct at this stage," *i.e.* on a motion to dismiss. *Id.*

The Court progressed to Plaintiffs' claims against MKURA and Mt. Kisco in its capacity as a purported successor to MKURA. The Court first determined that Plaintiffs had abandoned its

---

[7]     The Court also dismissed Plaintiffs' breach of contract claim against Merritt. *Id.*

[8]     In response to WCDH's argument that "it should not be held liable because its actions were akin to . . . promulgating disposal regulations" or "permitting disposal facilities," the Court determined that it would be "inappropriate . . . to make a determination as to the nature and bounds of" WCDH's conduct at the motion to dismiss stage. *Id.* at *10.

[9]     Below, the Court will provide additional clarification regarding whether it intended this portion of the 2017 Opinion to definitively characterize, as a matter of law, the 1960s work as remedial or removal.

claims against MKURA in failing to oppose Defendants' arguments. *Id.* at *10. Next, responding to Plaintiffs' contention that MKURA's dissolution was a "de facto merger" with Mt. Kisco, the Court explained that Plaintiffs failed to allege any facts establishing "continuity of ownership," the "'essence of a merger' and thus a necessary predicate to finding a de facto merger." *Id.* at *12 (quoting *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 212 (2d Cir. 2006)).

The Court then addressed individualized claims within Carozza's motion to dismiss. As an initial matter, the Court determined that Amanda's Lane and Stagg had standing to bring claims under CERCLA. *Id.* at *14. Next, the Court determined that Plaintiffs plausibly asserted claims for equitable estoppel against Carozza. *Id.* at *14-15. Turning to Carozza's contention that Plaintiffs' "state law claims" were governed by a binding arbitration agreement, the Court concluded that that "the parties consented to the arbitration of Stagg's claim for rescission of the Operating Agreement." *Id.* at *16. Nevertheless, but critically, the Court rejected Carozza's invitation "to find that Amanda's Lane [was] Stagg's alter ego, agent, or a beneficiary of the Agreement," explaining that "[w]hile it may ultimately be most efficient and perhaps appropriate for Amanda's Lane to arbitrate its 'state claims' along with Plaintiff Stagg, *at this early stage of litigation, the Court does not have enough information to make a determination as to the relationship between Stagg and Amanda's Lane*." *Id.* (emphasis added).

The Court concluded with the arguments applicable to multiple movants, namely whether Plaintiffs sufficiently pleaded claims of owner liability, operator liability, arranger liability transporter liability, and response costs. *Id.* at *17-22. The Court concluded, regarding owner liability, that Plaintiffs plausibly alleged claims against Carozza but dismissed claims against Mt. Kisco. *Id.* at *17-18. The Court next determined that Plaintiffs plausibly alleged operator liability claims against Carozza and Mt. Kisco. *Id.* at *19. As to arranger liability, the Court held that

Plaintiffs plausibly alleged claims against Carozza, Mt. Kisco, and WCDH. *Id.* at *19-20. The Court then concluded that Plaintiffs failed to allege a plausible claim for transporter liability against WCDH, Mt. Kisco, and Carozza. *Id.* at *20-21. Finally, without determining whether the responses were remedial or removal, the Court held that Plaintiffs plausibly alleged recoverable response costs under CERCLA.[10] *Id.* at *21-22.

## C. Plaintiffs' SAC

Th 2017 Opinion granted Plaintiffs leave to file a second amended complaint as to any claim not dismissed with prejudice. *See id.* at *22. On May 1, 2017, Plaintiffs filed the SAC.

The SAC advanced nine—rather than thirteen—causes of action. *First*, as they did in the FAC, Plaintiffs sought, under CERCLA § 107(a), declaratory judgment for operator liability, arranger liability, and transporter liability. (SAC at 30, 34, 36.) Plaintiffs also sought money judgment for past response costs under CERCLA.[11] (*Id.* at 37.) *Second*, Plaintiffs advanced four state law claims—namely, fraudulent inducement, unjust enrichment, money had and received, and equitable estoppel—against Carozza and Richard's Lumber. (*Id.* at 38-41.) *Finally*, Plaintiffs alleged negligent misrepresentation against Merritt. (*Id.* at 42.)

The SAC's substantive allegations were largely unchanged from the FAC. There were, however, several modifications that were seemingly in response to the 2017 Opinion. For example, the SAC removed numerous (but not all) references to dismissed defendants such as Teledyne, MKURA, and Does 1 through 50 and 51 through 100. (*Id.* at 3, 8-9, 11, 16, 36-41.) Finally, and as most relevant here, Plaintiffs added several new allegations to establish that

---

[10] The Court also concluded that Plaintiffs abandoned their claims for contribution and indemnification against all Defendants. *Id.* at *22.

[11] The defendants against whom Plaintiffs brought the four respective CERCLA claims were consistent with the 2017 Opinion's directive. For example, the third cause of action no longer listed Mt. Kisco, Carozza, and WCDH. (Decl. of Andrew Kazin in Opp. to Mt. Kisco's Mot. to Dismiss ("Kazin Decl."), ECF No. 214, Ex. B at 39.)

Merritt's owner, Charles Merritt, was aware of the importance of environmental site assessments, how they may be used and relied upon, and Merritt's purported awareness that the Phase I Report would be used by Plaintiffs. (*Id.* at 5, 28-30.)

### D. The Current Motions to Dismiss

After Plaintiffs filed the SAC, the parties were scheduled to proceed to discovery. (*See* ECF No. 179 (explaining that "[t]he timing of initial disclosures and a discovery schedule [was to] be discussed at the May 10, 2017 conference after the filing of the [SAC]").) However, on May 9, 2017, Merritt sought leave to file a motion to dismiss, which the Court granted with a briefing schedule. (ECF No. 185.) The Court also stayed discovery as to Merritt. (*Id.*) Defendants Mt. Kisco, WCDH, and Carozza subsequently sought leave to file motions to dismiss of their own. (ECF Nos. 186, 187, 188.) The Court granted the three defendants' requests, set a briefing schedule, and stayed discovery. (ECF No. 190.) In the interim, the United States filed an Answer and again asserted a counterclaim against Plaintiffs. (ECF No. 197.)

Thereafter, the parties filed their respective motions to dismiss. (*See* ECF Nos. 204, 208, 209, 228, and 231.) Defendants Mt. Kisco, WCDH, and Carozza advance two common arguments in seeking dismissal of Plaintiffs' CERCLA claims. Specifically, those three defendants argue that (1) Plaintiffs have failed to amend their complaint to allege removal activity under CERCLA, such that the SAC only alleges remediation claims that must be dismissed as time barred; and (2) to the extent Plaintiffs have pled removal costs, those claims are time barred under the applicable statute of limitations.[12] (Mt. Kisco Mem. of Law in Support of Mot. to Dismiss ("Mt. Kisco Mot."), ECF No. 212, at 11, 19; WCDH Mem. of Law in Support of Mot. to Dismiss ("WCDH Mot."), ECF No. 232, at 1, 3; Carozza Mem. of Law in Support of Mot. to Dismiss ("Carozza

---

[12]    Defendants Mt. Kisco and Carozza also argue that Plaintiffs cannot allege new removal action costs because there can only be one removal action, which has already occurred. (Mt. Kisco Mot. 23; Carozza Mot. 6.)

Mot."), ECF No. 229, at 3, 5.)  For its part, Mt. Kisco also maintains that Plaintiffs' CERCLA claims against it must be dismissed because the "public record" purportedly confirms that MKUSA, not Mt. Kisco, is the responsible party.  (Mt. Kisco Mot. 9.)

Individually, Carozza argues that the state law claims against him must be dismissed because the "SAC makes clear that the claim[s] asserted belong[] to Stagg" and therefore subject to arbitration.  (Carozza Mot. 7, 11.)  In the alternative, Carozza now argues that Plaintiffs' state law claims fail to state a cause of action "as there are no factual allegations sufficient to make out claims for rescission of the purchase agreement based upon fraudulent inducement, unjust enrichment, and 'money had and receipted.'"  (*Id.* at 11.)

Finally, Merritt's motion addresses the stand-alone negligent misrepresentation claim against it.  Merritt argues that Plaintiffs have again failed to include allegations in the SAC that establish a privity-like relationship between Plaintiffs and Merritt, and, as such, dismissal is warranted for the same reasons stated in the 2017 Opinion.  (Merritt Mem. of Law in Support of Mot. to Dismiss ("Merritt Mot."), ECF No. 206, at 17-23.)  Merritt also renews its motion for sanctions, contending that the SAC is frivolous and vexatious.  (*Id.* at 23.)

Plaintiffs oppose these motions.  *First,* Plaintiffs lambast the common arguments for dismissal of its CERCLA claims as "a blatant second bite at the proverbial apple."  (Pls. Opp. to Mt. Kisco Mot. ("Mt. Kisco Pls. Opp."), ECF No. 215, at 1.)  Specifically, Plaintiffs explain that they have alleged identical facts that the Court previously held were sufficient to state a claim, that they were not required to plead the type of response cost incurred in the SAC, and that, in any event, the statute of limitations has not run on any removal actions.  (Mt. Kisco Pls. Opp. 6-7; Pls. Opp. to WCDH Mot. ("WCDH Pls. Opp."), ECF No. 235, at 5, 8; Pls. Opp. to Carozza Mot. ("Carozza Pls. Opp."), ECF No. 237, at 4, 6, 8.)  *Second*, as to Mt. Kisco's contention that the

"public record" supports dismissal of claims against it, Plaintiffs argue that the Court must disregard the documents submitted by Mt. Kisco at the motion to dismiss stage. (Mt. Kisco Pls. Opp. 11-12.) *Third*, turning to Carozza's motion to dismiss the state law claims against him, Plaintiffs contend that (1) Carozza has not pointed to any facts that support piercing Amanda's Lane's corporate veil; and (2) Plaintiffs have sufficiently stated facts in the SAC that support each of their state law claims. (Carozza Pls. Opp. 10, 12.) *Finally*, regrading Merritt's motions, Plaintiffs aver that (a) they sufficiently allege facts establishing Merritt "knew that Plaintiffs were . . the only parties relying on the Phase I Report other than Bank United"; and (b) sanctions are not warranted. (Pls. Opp. to Merritt Mot. ("Merritt Pls. Opp."), ECF No. 203, at 3, 10.)

The United States also opposes the motions to dismiss the CERCLA claims. (U.S. Mem. of Law in Opp. to Defs.' Mot. to Dismiss ("Gov't Opp."), ECF No. 224.) The United States argues that the Court should (1) reconsider its conclusion that CERCLA's statute of limitations could apply to pre-enactment conduct; or (2) reserve any decision on whether CERCLA's statute of limitations is triggered, as a more robust factual records is needed to make such a determination.[13] (*Id.* at 7, 10.)

This opinion followed.

## LEGAL STANDARDS

Under Rule 12(b)(6), courts must assess whether a complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "'not

---

[13] The United States also argues, in response to Mt. Kisco and Carozza's motions, that the Court should not conclude that CERCLA only permits one removal action at a site. (*Id.* at 15.)

bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id*. at 662. A claim is facially plausible when the facts pleaded allow a court to make "a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## DISCUSSION

### I.   Motions to Dismiss CERCLA Claims

#### A. Dismissal Based on Applicable Statutes of Limitation

In their motions, Mt. Kisco, WCDH, and Carozza argue that Plaintiffs have "simply re-pled the time-barred remedial action claims that were dismissed 'with prejudice." (Mt. Kisco Mot. 12; Carozza Mot. 3 (same); WCDH Mot. 3 (same).) These Defendants maintain, given the accepted definitions and characterizations of remedial and recovery actions under CERCLA, that the SAC's allegations related to past and future rehabilitative conduct at the Property can only be characterized as remedial. (Mt. Kisco Mot. 12-13; Carozza Mot. 3-4; WCDH Mot. 4-6.) Thus, Defendants aver, even under a liberal reading, Plaintiffs' claims seemingly are barred under the statute of limitations delineated in CERCLA. (*Id.*) This Court disagrees. Defendants contentions are belied by the law of the case on these issues, and it remains premature for the Court to assess whether the statute of limitations ultimately bar Plaintiffs' claims.

Under the law of the case doctrine, "'[w]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)); *see also Pescatore v.*

*Pan Am. World Airways, Inc.*, 97 F.3d 1, 7-8 (2d Cir. 1996) ("The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"). The doctrine does not "rigidly bind a court to its former decisions." *Colvin v. Keen*, 900 F.3d 63, 68 (2d Cir. 2018); *accord Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 842 (S.D.N.Y. 2018) (explaining that the law of the case doctrine is "discretionary and does not limit a court's power to reconsider its own decisions" (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992))). Even so, courts generally will not depart from a prior decision unless there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."[14] *Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983); *Olin Corp.*, 332 F. Supp. 3d at 842 (same).

Here, Defendants offer no compelling reason for this Court to deviate from the 2017 Opinion. As an initial matter, Defendants do not point to any change in controlling law or availability of new evidence that would warrant this Court reversing its prior determinations made. Accordingly, Defendants can only seek potential refuge by showing that the 2017 Opinion was clear error or that a change is needed to prevent manifest injustice. But Defendants fail to do so.[15]

---

[14]    Although not applicable here, the Court notes that, as a ruling on a motion to dismiss does not address the merits of the case, the law of the case doctrine does not necessarily "preclude [] [c]ourt[s] from reconsidering issues on summary judgment that have initially been raised in the context of a motion to dismiss." *RSL Commc'ns PLC v. Bildirci*, No. 04 Civ. 5217(RJS), 2009 WL 454136, at *2 (S.D.N.Y. Feb. 23, 2009).

[15]    Mt. Kisco argues that reconsideration of the 2017 Opinion is warranted to avoid "manifest injustice." (Mt. Kisco Reply to Mt. Kisco Pl. Opp. ("Mt. Kisco Reply"), ECF No. 213, at 3-4.) Specifically, Mt. Kisco contends that it would be manifest injustice to force it to defend this action in light of a "contradictory" public record and the "wholesale absence of any factual content plausibly linking the Village." (*Id.* at 4.) This ultimately pertains to Mt. Kisco's argument related to dismissal on the basis of the public record, which will be addressed below, and does not otherwise support overturning this Court's prior position related to the characterization of Plaintiffs' prior or future response effort and the applicability of CERCLA's statute of limitations, or the plausibility of their claims.

To begin, Defendants do not dispute that, substantively, the SAC is largely the same as the FAC. (*See generally* Kazin Decl. Ex. B (detailing the changes between the SAC and the FAC).) Indeed, the most significant substantive edits are the new allegations related to Merritt's owner, Charles Merritt (*id.* at 28); the CERCLA-related allegations, in general, have been untouched. Therefore the Court had the occasion in its 2017 Opinion to consider the same substantive allegations now challenged by Defendants. *2017 Opinion*, 2017 WL 1194700 at *8-9.

On that previous record, the Court determined that it could not "discern the nature of Plaintiffs' conduct at this [motion to dismiss] stage, whether categorically 'remedial' or 'removal.'" *Id.* at *9. And for good reason. Though the inquiry of whether an action should be characterized as "remedial" or "removal" is a question of law, "this inquiry often can hinge upon the resolution of certain factual questions." *Inc. Vill. of Garden City v. Genesco, Inc.*, 596 F. Supp. 2d 587, 602 (E.D.N.Y. 2009), *modified on other grounds*, 2009 WL 3081724 (E.D.N.Y. Sept. 23, 2009). As such, the resolution of this issue—and thus whether CERCLA claims are barred under applicable statute of limitations—is often done during summary judgment or later. *See, e.g.*, *N.Y.S. Elec. and Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 217-20 (2d Cir. 2014) ("*NYSEG*") (issue of whether action was remedial or removal resolved following a bench trial); *New York v. Next Millenium Realty, LLC*, 732 F.3d 117, 124 (2d Cir. 2013) (issue of remedial versus removal determined on summary judgment); *New York v. Gen. Elec. Co.*, No. 1:14-CV-747 (CFH), 2017 WL 1239638, at *13-14 (N.D.N.Y. Mar. 31, 2017) (same); *MPM Silicones, LLC v. Union Carbide Corp.*, No. 1:11-CV-1542 (BKS/ATB), 2016 WL 3962630, at *11-14 (N.D.N.Y. July 7, 2016) (same). Here, Defendants do not point to a *single* case where a court on a motion to dismiss concluded that a recovery response. And, although the Court has identified one such case in its own research, both parties there had stipulated that they would not introduce any new evidence or

facts beyond those in the complaint.  *See OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 524 (D. Conn. 2007).[16]  There is no such agreement here.

Defendants further attempt to argue that Plaintiffs' "use of terms 'remediation' and 'remedy' in pleading their claims should be determinative given their pleading obligations under *Twombly* and *Iqbal*."  (Mt. Kisco Mot. 13-19; *accord* WCDH Mot. 5; Carozza Mot. 4-5.)  They also argue that the factual allegations purportedly can only lead to one conclusion regarding the nature of the prior work performed.  (*Id.*)  As an initial matter, the Second Circuit has plainly held that "generic uses of the word 'remedial' [or removal] . . . do[] not render an action 'remedial' for purposes of the statute of limitations."  *Next Millenium Realty,* 732 F.3d at 130.  Of course, those prior and future response efforts articulated in the SAC may ultimately lend themselves to one particular classification on summary judgment, when both parties have an opportunity to provide a full factual record.  But this is a motion dismiss.  The Court may only consider the four corners of the complaint and any accompanying documents, accepting all facts as true, and it must draw all reasonable inferences in Plaintiffs' favor.  Given this standard, it would be premature of the Court to make a consequential, fact-dependent legal determination merely based on the SAC's short and plain statement of facts and (potentially imprecise) language.[17]  This was true in the 2017 Opinion, and it remains true now.

---

[16]    The *OBG* court also recognized, consistent with other courts in this circuit, that "[w]hether OBG's actions are properly characterized as remedial or removal actions is a question of law for the Court to decide" but that "[i]n answering that legal question . . . a court ordinarily may benefit from a more fully-developed record." *Id.* at 524.

[17]    As noted above, he Government urges the Court (1) to conclude that the alleged 1960s cleanup activities cannot trigger CERCLA's limitation periods, or (2) in the alternative, to reserve classifying, as either remedial or removal, the cleanup efforts so that a more robust factual record is developed. (Gov't Opp. 7, 10.)  On the first issue, the Court is cognizant that CERCLA did not have a statute of limitation until the enactment of the Superfund Amendments and Reauthorization Act ("SARA") of 1986. *See NYSEG*, 766 F.3d at 231 n.16.  The Government, however, cites no cases supporting its proposition that the statute of limitations cannot run on pre-enactment activity.  The Court concludes that, given SARA's subsequent enactment, the statues of limitation on pre-SARA claims began to run when the SARA amendments took place, *i.e.*, on October 17, 1986. *See N.Y.S. Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 509 n.51 (S.D.N.Y. 2011*), aff'd in part and vacated in part on other grounds*, *NYSEG*, 766 F.3d at 212; *see*

20

At bottom, Defendants do not point to any intervening change of controlling law, availability of new evidence, or the need to correct a clear error or prevent manifest injustice, that justifies this Court's departure from the 2017 Opinion and its declination to characterize Plaintiffs' conduct under CERCLA at the motion to dismiss stage. Defendants' motions to dismiss Plaintiffs' CERCLA claims are DENIED.[18]

## B. Dismissal Based on Public Record as to Mt. Kisco

Mt. Kisco advances a separate argument for dismissal of the CERCLA claims against it. Specifically, Mt. Kisco argues that "public records" concerning "the alleged demolition and decontamination efforts of the Refinery" and "the construction of Railroad Avenue" confirm that MKURA, not Mt. Kisco, engaged in this work. (Mt. Kisco Mot. 10-11.) In support, Mt. Kisco offers eight documents of which it urges this Court to take judicial notice and consider in resolving its motion to dismiss. (*Id.*; *see also* Aff. of Whitney W. Singleton, ECF No. 211, Exs. A-H.)

On a motion to dismiss, a court "may review only a narrow universe of materials" without converting the motion into one for summary judgment. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This generally includes "the factual allegations in plaintiffs' amended complaint, which are accepted as true, [] documents attached to the complaint as an exhibit or incorporated in it by reference, . . . or [] documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d

---

*also Velsicol Chem. Corp. v. Enenco, Inc.*, 9 F.3d 524, 529 (6th Cir. 1993) ("Accordingly, we conclude that under the prospective application of section 113(g)(2), Velsicol had, at the very least, three years from the effective date of statute of limitations, or until October 17, 1989, to file its cost recovery claim."). As to the Government's alternate request, the Court notes that it did not intend to definitively characterize, as a matter of law, the recovery and restoration efforts conducted prior to Plaintiffs' involvement with the Property. Such a conclusion plainly warrants factual development. Nevertheless, to the extent the Court needs to revise its conclusion, the Court *sua sponte* reconsiders its prior ruling to make clear that it has not decided whether the 1960s activity at the Property was remedial or removal. *See Davis v. Masunaga Grp., Inc.*, 204 F. Supp. 2d 665, 667 (S.D.N.Y. 2002) (reconsidering decision given its analysis calling prior legal ruling into question).

[18]   Given this Court's ruling, it need not consider Defendants' contentions that the statute of limitations has run on any purported removal actions, nor will this Court, at this time, weigh in on whether there can be more than on removal action under CERCLA.

142, 150 (2d Cir. 1993). A court may also take judicial notice of documents but cannot rely on them for the truth of the matters asserted therein. *Powell v. Dep't of Educ. of City of N.Y.*, No. 14 CV 2363 (PKC), 2015 WL 5772211, at *1 (E.D.N.Y. Sept. 30, 2015).

Courts generally take judicial notice of public documents or matters of public record. *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411 (S.D.N.Y. Sept. 30, 2011) (judicial notice of "publicly available documents" permitted). Even so, these documents must still be "accurately and readily determined from sources whose accuracy cannot be reasonable questioned." *See* Fed. R. Evid. 201(b).

Here, Mt. Kisco's "public records" do not meet the standard for judicial notice. Mt. Kisco seemingly contends that the documents it has attached are all public records because they are "readily available to Plaintiffs through the Freedom of Information Act ('FOIA')." (Mt. Kisco Mot. 8.) Yet where documents must be obtained through a FOIA request (or state equivalent) they cannot be deemed to contain facts that are *readily* determined. *See Casey v. Odwalla, Inc.*, 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018) (explaining that letter that could only be obtained from FDA through a FOIA request was not susceptible to judicial notice); *White Plains Housing Auth. v. Getty Properties Corp.*, No. 13-CV-6282 (NSR), 2014 WL 7183991, at *2 (S.D.N.Y. Dec. 16, 2014) (declining to judicially notice materials acquired through New York's Freedom of Information Law, which the Court described as "an assortment of discovery materials"); *Fahs Const. Group, Inc. v. Gray*, No. 3:10-CV-0129 (GTS/DEP), 2012 WL 2873532, at *4 (N.D.N.Y. July 12, 2012), *aff'd*, 725 F.3d 289 (2d Cir. 2013) (declining to judicially notice records "not prepared for review for the general public and [that] could be obtained only by a time-consuming response to a FOIL request").

The cases relied on by Mt. Kisco do not compel a different result. For example, in *Quick Cash of Westchester Ave. LLC v. Vill. of Port Chester*, No. 11-CV-5608 (CS), 2013 WL 135216 (S.D.N.Y. Jan. 10, 2013), the court took judicial notice of board meeting minutes because they were "available to the public at [Port Chester's] Village hall" and were also available on Port Chester's website. *Id.* at *4. Here, Defendants do not indicate that the "public records" they provide are of a similar public accessibility. As to *Sandy Hollow Assocs. LLC v. Inc. Vill. of Port Washington N.*, No. CV 09-2629 (SJF)(AKT), 2010 WL 6419570 (E.D.N.Y. Sept. 6, 2010), the court detailed a long list of documents and exhibits that were offered for consideration on a motion to dismiss. *Id.* at *7-8. The court, however, did not provide a document-by-document analysis to explain what documents were incorporated by reference, integral to the complaint, or matters of public record. *Id.* at *8. Simply put, Mt. Kisco provides no basis for taking judicial notice.

In sum, the Court declines to consider the eight documents provided by Mt. Kisco, and again reaffirms the law of this case at the motion to dismiss stage: drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have provided sufficient factual content in the SAC to state a claim against Mt. Kisco for Operator Liability and Arranger Liability.[19] *See 2017 Opinion*, 2017 WL 1194700 at *18-19. Mt. Kisco's motion is DENIED.

## II. Motion to Dismiss State Law Claims against Defendant Carozza

Carozza argues that Plaintiffs' state law claims against him belong to Stagg and should be subject to arbitration. (Carozza Mot. 11.) In so arguing, Carozza maintains that, to the extent the SAC references Amanda's Lane, it is merely a stand-in for Stagg. (*Id.*) In the alternative, Carozza

---

[19]     Mt. Kisco alternatively urges the Court to consider these documents integral to the complaint. (Mt. Kisco Mot. 10 n.4.) However, regardless of whether Plaintiffs, following Mt. Kisco's initial motion to dismiss, had actual notice of the documents at issue, there is no indication that the Plaintiffs relied upon them in setting forth their claims. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). In any event, even if the Court did consider the documents, they do not definitively contradict the SAC's allegations, which, the Court again notes, it must accept as true while drawing all reasonable inferences in Plaintiffs' favor.

maintains that Plaintiffs have failed to sufficiently state claims for relief. (*Id.*) Plaintiffs counter that this Court already concluded that it did not have enough information to determine the relationship between Stagg and Amanda's Lane, and that Carozza had not come forward with any evidence to pierce the corporate veil on a motion to dismiss. (Carozza Pls. Opp. 10.) Plaintiffs moreover argue that there are numerous allegations specifically detailing how Carozza's scheme implicated Amanda's Lane's, and that they have plausibly established all the requisite elements of their state law claims against Carozza (*id.* at 10, 12-13).

As was the case with the FAC, the SAC is brimming with allegations related to actions taken by Amanda's Lane in reliance of Carozza's conduct. (*See, e.g.*, SAC ¶¶ 133-34, 142, 145, 247-50, 256-59, 265-68.) Nevertheless, Carozza essentially re-invites the Court to find that Amanda's Lane is nothing but an alter ego of Stagg. (Carozza Mot. 11.) It is true that certain allegations indicate that Stagg acted through Amanda's Lane when purchasing the Property and paying off judgments in reliance of Carozza's alleged fraud. (*See, e.g.*, SAC ¶¶ 133-34, 145.) But the Court must nevertheless accept the facts alleged in the SAC as true and draw all reasonable inferences in Plaintiffs' favor. On that standard, the Court again reiterates that, while discovery may reveal that Amanda's Lane is merely Stagg's alter ego, at this early stage of litigation, the Court does not have enough information to assess the relationship between Stagg and Amanda's Lane. *See, e.g.*, *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. A & M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.*, 314 F. Supp. 2d 332, 347 (S.D.N.Y. 2004) ("When considering whether a party is the alter ego of a signatory . . . the court weighs a number of different factors, no single one of which is dispositive, including whether the two entities have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership." (internal quotation marks and citations omitted)).

Accordingly, the Court concludes that the SAC contains sufficient, well-pleaded facts establishing that Amanda's Lane has pleaded its own state law claims against Carozza. And as explained below, the facts can withstand a motion to dismiss.

## A. Rescission Based on Fraudulent Inducement[20]

Although parties generally may only avoid a contract because of a mutual mistake, in some cases, a unilateral mistake may warrant rescission. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 902 (S.D.N.Y. 1988) (citing *John Hancock Mut. Life v. Carolina Power & Light*, 717 F.2d 664, 671 (2d Cir. 1983)). To rescind a contract based on unilateral mistake, a plaintiff must show "misrepresentation, concealment or nondisclosure of a material fact; an intent to deceive; and an injury resulting from justifiable reliance by the aggrieved party." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 585 (2d Cir. 2005).

Here, Plaintiffs meet each element. *First*, the SAC alleges that Carozza knew of, but did not disclose, the conditions the Property when soliciting Plaintiffs to purchase the Property and provide him with financial assistance. (SAC ¶¶ 108-120, 129, 131, 137-41.) *Second*, the SAC alleges that Carozza intended to use this misrepresentation to induce Plaintiffs to purchase the Property, take over the Property's mortgage, and pay off Carozza's debts to the Teamsters. (*Id.* ¶¶ 125-27.) *Finally*, Plaintiffs relied on these representations and had no reason to think there were any issues with the Property. (*Id.* ¶¶ 133-34, 142, 145, 150.) Plaintiffs have sufficiently pleaded a claim for rescission based on unilateral mistake and Carozza's motion to dismiss is DENIED.

## B. Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must plead facts that establish that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate

---

[20] It is unclear whether Plaintiffs seek a fraudulent inducement claim or claim of rescission based on a unilateral mistake based on how the SAC is drafted. Regardless, the elements are largely the same.

against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). Here, Plaintiffs again plead sufficient facts to survive Carozza's motion to dismiss. *First*, Plaintiffs allege that Carozza had both his mortgage debt and judgment to the Teamsters satisfied as a result of his misrepresentations. (SAC ¶¶ 133, 145.) *Second*, the SAC makes clear that this benefit was derived from Plaintiffs, including Amanda's Lane. (*Id.*) *Finally*, given that the benefit was procured through alleged misrepresentation/concealment, equity and good conscience would militate against defendant retaining the enrichment. Carozza's motion to dismiss is DENIED.

### C. Money Had and Received

Similar to an unjust enrichment claim, a claim for "money had and received" requires facts that establish that "(1) the defendant received money belonging to the plaintiff, (2) the defendant benefited from receipt of the money, and (3) under principles of equity and good conscience, the defendant should not be permitted to keep the money." *Lebovits v. Bassman*, 992 N.Y.S.2d 316, 318 (App. Div. 2d Dep't 2014) (quoting *Goel v. Ramachandran*, 975 N.Y.S.2d 428, 436 (App. Div. 2d Dep't 2013)). Here, the SAC's allegations are sufficient to withstand a motion to dismiss. Plaintiffs have alleged that Carozza received money that had previously belonged to them and benefitted by having his mortgage debts cleared and judgments against him satisfied. And, like it did in the unjust enrichment claim, the alleged procurement of a benefit by misrepresentation would militate against keeping the money. Again, Carozza's motion to dismiss is DENIED.

## III. Merritt's Motions

### A. Motion to Dismiss Negligent Misrepresentation Claim

In reviewing the FAC, this Court concluded that Plaintiffs failed to allege sufficient facts establishing a privity-like relationship with Merritt. *2017 Opinion*, 2017 WL 1194700 at *5. In so holding, the Court rejected Plaintiffs' reliance on the language in the contract between Merritt

and BankUnited, which did not identify or address Plaintiffs in any way. *Id.* It further noted that the actual report was not intended to be used by any other party besides BankUnited. *Id.* As such, Plaintiffs failed to establish the requisite direct link to plausibly state a claim for negligent misrepresentation. *Id.*

The SAC includes several new allegations detailing Charles Merritt's awareness that environmental reports can be "heavily relied upon by others," particularly for the "knowledge to make better business decisions." (SAC ¶¶ 170-71.) Plaintiffs also now rely on language from Mr. Merritt's affidavit submitted for the prior motion to dismiss. (*Id.* ¶ 178.) Finally, Plaintiffs point to the fact that (1) according the Service Agreement between Merritt and BankUnited, Merritt was required to address the Phase I Report to both BankUnited and its (unspecified) borrower,[21] (2) that the Service Agreement required Merritt to include language allowing a "limited number of [unspecified] investors" to use and rely on the report "in connection with a planned loan involving the subject property,"[22] and (3) Merritt interviewed Carozza in connection with report. (*Id.* ¶¶ 285, 292-93.) In all other respects, the SAC's allegations generally mirror the FAC. (*See* Kazin Decl. Ex. B at 27, 29-31.)

Based on these additions, Plaintiffs take the position that the SAC now establishes that the Phase I Report was "generated with an end and aim of reliance by a third party, to wit, Plaintiffs." (Merritt. Pl. Opp. 6.) To this end, Plaintiffs contend that they are the "fixed, definite, and

---

[21]  In the same paragraph, the Agreement states that Merritt "should determine if the report is being utilized by the Client for any transaction." (Decl. Peter Skelos in Support of Merritt Mot. ("Skelos Decl."), ECF No. 205, Ex. D at "Exhibit B" p.1.) The Phase I Report does not reveal any awareness by Merritt of any transactional use. Moreover, notwithstanding this language, the Phase I Report states that it was "Prepared for Bank United" and lists no one else. (Skelos Decl. Ex. C at 7.) The Court is permitted to consider documents, such as the Phase I Report and Service Agreement, that are integral to the complaint. *See Barbato v. U.S. Bank Nat'l Ass'n*, No. 14-CV-2233 (NSR), 2016 WL 158588, at *5 (S.D.N.Y. Jan. 12, 2016).

[22]  This language also does not appear in the Phase I Report. Instead, in a section titled "Reliance," the Phase I Report states that the report was "prepared for the sole use of [Merritt's] client" and that "[n]o other party may use the report without [its] written authority." (Skelos Decl. Ex. C, at 7.)

identifiable class of persons who would naturally rely on the Phase I Report," and that the transmittal of the report to them was the "certain, natural and deliberate willful end and aim of the transaction." (*Id.* at 7.)  The Court disagrees.

As previously explained in the 2017 Order, a claim for negligent misrepresentation requires the plaintiff to plausibly allege "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011) (citing *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007)).  In the absence of a contractual relationship, as here, plaintiffs must sufficiently allege the establishment of a relationship tantamount to contractual privity.  *Ridge Seneca Plaza, LLC v. BP Prod. N. Am. Inc.*, 545 F. App'x 44, 46 (2d Cir. 2013) (summary order) (citing *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 382 (1992)).

To assert that a relationship nearing privity exists, the factual allegations in the SAC must plausibly allege that: (1) Merritt was aware its Phase I Report would be used for the particular purpose of informing Plaintiffs' loan refinance decision; (2) Plaintiffs, a known party to Merritt, relied on the Report in furtherance of its refinance decision; and (3) there was some conduct by Merritt linking it to Plaintiffs and evincing Merritt's understanding that Plaintiffs would rely on the Report.  *Id.*; *State of Cal. Pub. Emps.' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 434 (2000) (same).  This "linking conduct" generally consists of "some form of direct contact between the [the parties], such as a face-to-face conversation, the sharing of documents, or other 'substantive communication' between the parties."  *BDO Seidman*, 222 F.3d at 75  (internal quotations and citations omitted) (noting the standard to establish "linking conduct" is "high").  In

other words, the relationship must be so close as to be "construed as the functional equivalent of privity." *Williams and Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1183 (2d Cir. 1993).

Plaintiffs have buttressed their contention that Merritt may have been aware that the Phase I Report could be used for a particular purpose. But the SAC remains devoid of non-conclusory allegations establishing the requisite "linking conduct." As an initial matter, Mr. Merritt's general awareness that other parties may use environmental assessments—or even the Service Agreement's (seemingly unincorporated) language regarding borrowers and investors—does not indicate that Merritt knew that this report prepared for BankUnited would specifically be used by Plaintiffs. Indeed, a foreseeable use of a report—even when its transfer is an "end and aim of the transaction" (Merritt Pl. Opp. 7)—does not link parties. *See Mandarin Trading*, 16 N.Y.3d at 181 ("[T]his Court has 'previously rejected a rule 'permitting recovery by any 'foreseeable' plaintiff who relied on the negligently prepared report, and have rejected even a somewhat narrower rule that would permit recovery where the reliant party or class of parties was actually known or foreseen' but the individual defendant's conduct did not link it to that third party.'" (quoting *Parrott v. Coopers & Lybrand*, 95 N.Y.2d 479, 485 (2000)).

Moreover, Plaintiffs' contention does not change the fact that Merritt's report was only meant for BankUnited. (Skelos Decl. Ex. C, at 2.) To reiterate, the Phase I Report—the Service Agreement notwithstanding—is abundantly clear it was "prepared for the *sole use* of [Merritt's] clients" and "[n]o other party may use the report without [Merritt's] written authority."[23] (*Id.* at 7

---

[23] Plaintiffs contend that they are not bound by this limiting language of the Phase I Report. (Merritt. Pl. Opp. 9-10.) However, they rely on cases that are plainly inapposite because they deal with breach of contract claims against a nonparty or the assignments and destruction of rights in the copyright context. In any event, Plaintiffs are incorrect in their contention that enforcing what is effectively a "negating clause" would "impermissibly enable the contracting parties to manage their costs and risks through contractual clauses while simultaneously imposing risks on others." (*Id.* at 10.) Indeed, "courts within this Circuit have consistently held that 'even where a contract expressly sets forth obligations to specific individuals or categories of individuals, those individuals do not have standing to enforce those obligations by suing as third-party beneficiaries when the contract contains a negating clause.'" *Wilson v. Dantas*, 746

(emphasis added).)  As it did to the FAC, this language belies this rehashed contention that there is a privity-like relationship between Merritt and Plaintiffs.[24]

That Merritt allegedly interviewed Carozza does not alter this conclusion.  As Plaintiffs note, the Merritt report mistakenly identifies Carozza and George L. Griffin as the Property's owners.  (SAC ¶ 175 n.6.)  Therefore, to the extent Merritt contacted Carozza, it appears that it was ultimately unaware of his association with Plaintiffs, likely due to his alleged fraudulent scheme—a reasonable inference essentially conceded by Plaintiffs (see Merritt Pl. Opp. 7 n.1).  In fact, there does not appear to be any non-conclusory indication in the SAC that Merritt may have thought the Phase I Report would be used by Carozza and Griffin.  Simply put, Merritt's contact with Carozza strikes this Court as insufficient to "create such an extraordinary obligation" of privity between Merritt and Plaintiffs (about whom Merritt otherwise was unaware).  See Sec. Pac. Bus. Credit, Inc. v. Peat Marwick Main & Co., 79 N.Y.2d 695, 705 (1992).

Moreover, to the extent Plaintiffs' point to cases, such as White v. Guarente, 43 N.Y.2d 356 (1977), Kidd v. Havens, 577 N.Y.S.2d 989 (App. Div. 4th Dep't 1991), and Schwartz v. Michaels, No. 91 CIV. 3538 (RPP), 1992 WL 184527 (S.D.N.Y. July 23, 1992), for the proposition that Merritt knew its report was going to be used by a definite, fixed, and identifiable class of persons, such reliance is misplaced.  For example, in White, defendant was an accountant that had

---

F.3d 530, 537 (2d Cir. 2014); see also Nepco Forged Prods., Inc. v. Consol. Edison Co. of N.Y., Inc., 470 N.Y.S.2d 680, 681 (App. Div. 2d Dep't 1984) ("Where a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, as exists in the agreement at bar, that provision is decisive.").

[24]  Plaintiffs' allege that Mr. Merritt conceded in his previous affidavit that the Property's site assessment was "performed . . . 'in connection with a loan application by which the plaintiffs, collectively, sought to refinance underlying and existing debt.'"  (SAC ¶ 178.)  However, as Merritt correctly notes, his assertion was in the context of his understanding of the allegations in the complaint.  (Skelos Decl. Ex B ¶ 8 ("According to the complaint . . . the Merritt Phase I Environmental Site Assessment was not performed in connection with a purchase-money mortgage transaction but rather was conducted in connection with a loan application by which the plaintiffs . . sought to refinance underlying and pre-existing debt.").)  Merritt also made clear in that same affidavit that the Phase I Report was "conducted and prepared exclusively for the benefit of [BankUnited]."  (Id. ¶ 12.)

been retained by a limited partnership to perform auditing and tax return services. 43 N.Y.2d at 358-59. The court concluded that because defendant was performing services for a limited partnership, "a limited partner [in that partnership] would necessarily rely on or make use of the audit and tax returns of the partnership." *Id.* at 361-62. Here, Merritt's client was BankUnited. Merritt may have been aware that an unrelated third party could rely on the report, but reliance by an unrelated party stands in stark contrast to reliance by known partners within a partnership.

Likewise, the court in *Kidd* focused on the "unique nature of the title reporting business, the custom and usage of that profession, and the particular circumstances of this transaction" when determining that linking conduct was sufficiently pleaded. 577 N.Y.S.2d at 992. In that setting, "linking conduct" was established because (1) the title reports at issue were to be used "for the specific purpose of facilitating a sale or mortgage of the property," (2) "in the custom and usage of the title reporting business generally, [] certification [was] intended for the benefit of, and reliance by, a particular lender or purchaser to whom it will be delivered," and (3) "the service rendered by the [title company] was primarily for the information of a third person, in effect, if not in name, a party to the contract." *Id.* at 992-93. At most, Plaintiffs here have alleged that it was aware an environmental site assessment provides others with "knowledge to make better business decisions regarding potential environmental issues." (SAC ¶ 170.) But that does not establish the linking conduct necessary to establish privity.

Finally, in *Schwartz*, defendant, who was an accountant, knowingly prepared misleading forecasts and offering materials that he intended to specifically be used by his co-defendants to solicit investments from a "select group of qualified investors." 1992 WL 184527 at *31-32. Here, there are no such allegations—beyond references to general language in the Service Agreement about addressing the report to an unspecified borrower and allowing it to be used by investors—

that Merritt knew how BankUnited would use the report.[25]  Again, as noted above, Merritt created the report for the sole use of BankUnited and required written authorization for any other party to use.  (Skelos Decl. Ex. C at 7).

In sum, Plaintiffs have not sufficiently alleged a direct link to Merritt to support their negligent misrepresentation claim.  The Court GRANTS Merritt's motion to dismiss.

### B. Motion for Sanctions

In addition to moving to dismiss, Merritt again seeks sanctions under 28 U.S.C. § 1927 "because of Plaintiffs' unreasonable multiplication of litigation by filing the SAC."  (Merritt Mot. 23.)  Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  To impose sanctions, "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, 'motivated by improper purposes such as harassment or delay.'"  *Kim v. Kimm*, 884 F.3d 98, 106 (2d Cir. 2018) (quoting *Eisemann v. Green*, 204 F.3d 393, 396 (2d Cir. 2000)).  These findings "must be supported by a high degree of specificity."  *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143 (2d Cir. 2012) (internal quotations and citations omitted).  Moreover, courts will construe the statute "narrowly and with great caution, so as to not stifle the enthusiasm or chill the creativity that is the very lifeblood of the law."  *Rosado v. Enhanced Recovery Corp.*, No. 17-CV-5920 (VSB), 2019 WL 4686521, at *2 (S.D.N.Y. Sept. 26, 2019) (quoting *Mone v. C.I.R.*, 774 F.2d 570, 574 (2d Cir. 1985)).  Here, although Plaintiffs have failed to sufficiently state a claim of negligent misrepresentation against Merritt, the Court

---

[25]    To reiterate, Plaintiffs' reliance, at SAC paragraph 178, on Charles Merritt's "concession" about the use of the report is ultimately belied by the full context of that filing, and Plaintiffs allege no other non-conclusory facts that would support the inference that Merritt knew that the end goal of the Phase I Report was to support Plaintiffs' mortgage refinancing.

will decline to exercise its discretion to impose the extraordinary remedy of sanctions. Merritt has failed to establish with clear evidence that Plaintiffs lacked a good faith basis to assert their claims against Merritt, or that their conduct was otherwise frivolous or designed simply to unreasonably multiply litigation. Merritt's motion for sanctions is DENIED.[26]

## CONCLUSION

For the foregoing reasons, Defendants WCDH, Mt. Kisco, and Carozza's motions to dismiss are DENIED. Defendant Merritt's motion to dismiss is GRANTED and Merritt's motion for sanctions is DENIED. Defendant Merritt is dismissed from this action.

The remaining defendants are directed to file responsive pleadings by January 20, 2020. The parties are also directed to contact the chambers of Magistrate Judge Judith C. McCarthy to schedule a status conference. Finally, consistent with Magistrate Judge McCarthy's February 15, 2018 order (ECF No. 248), the parties must exchange initial disclosures within five (5) days of this Opinion.

The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 204, 208, 209, 228, and 231. As there are no remaining claims against Defendant Merritt Environmental Consulting Corp., the Clerk of the Court is also directed to terminate that defendant from the case caption. Finally, the Clerk is respectfully directed to lift the stay in place on this case.

Dated:  December 2019                         SO ORDERED:
        White Plains, New York

                                              _____
                                                  NELSON S. ROMÁN
                                              United States District Judge

---

[26] For the same reasons, the Court likewise declines to entertain Plaintiffs' invitation to consider sanctioning Merritt for bringing a motion for sanctions against it.